STATE OF NORTH CAROLINA v. EVA KATHLEEN BARLOWE

No. COA02-579

(Filed 15 April 2003)

**Criminal Law— continuance to obtain expert—denial—constitutional violation**

The denial of a continuance violated a first-degree murder defendant's constitutional rights to confront her accusers, to effective assistance of counsel, and to due process of law where defendant sought more time in which to obtain a blood splatter expert. There was no sound reason in the record for the denial of the continuance given the penalty faced by defendant and the materiality of the issue on which defendant sought advice and testimony, and the State did not carry its burden of showing that the ruling was harmless beyond a reasonable doubt. U.S. Const. amends. V, VI, XIV; N.C. Const. art. I, §§ 19, 23.

Appeal by defendant from judgment entered 28 September 2001 by Judge James U. Downs in McDowell County Superior Court. Heard in the Court of Appeals 17 February 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant, for the State.*

*C. Frank Goldsmith, Jr., and Amy E. Ray, for defendant-appellant.*

MARTIN, Judge.

Defendant was indicted for the first degree murder of her mother, Cynthia Barlowe. She appeals from a judgment sentencing her to life imprisonment without parole entered upon her conviction by a jury of first degree murder.

Briefly summarized only to the extent required for an understanding of the dispositive issue raised by defendant's appeal, the evidence at trial tended to show that Cynthia Barlowe was murdered in the garage of her home in Nebo, N.C., on 23 September 2000, by defendant's then-boyfriend, Jeremy Dunlap. Dunlap, who was twenty years old at the time of the murder, testified to choking Mrs. Barlowe with his arm and then striking her in the head three times with a large metal flashlight. The evidence also showed that defendant, a seventeen-year-old high school senior at the time, was present at the house at the time of the murder and participated in cleaning up the garage, transporting her mother's body to a relatively secluded location near a lake where it was set on fire, and letting her mother's car roll off a nearby embankment. The evidence is in conflict as to whether defendant joined Dunlap in planning and committing the murder.

Testimony by both Dunlap and defendant, as well as others with whom Mrs. Barlowe and defendant spoke on the day of the murder, indicates that Mrs. Barlowe had discovered defendant and Dunlap together in defendant's bed the night before. According to defendant, Mrs. Barlowe ordered Dunlap to leave and expressed anger and disappointment with defendant. Defendant had also been found by her mother and father in bed with a different young man a few months earlier. Her father had been enraged and had struck the wall near defendant with a pool cue and dragged the young man around the room by his hair before he could leave the house. Mr. Barlowe had then punished defendant by refusing to speak with or show affection to her for several days.

The morning after Mrs. Barlowe found defendant and Dunlap in defendant's bed, defendant drove Mrs. Barlowe to a party in their neighborhood. Mrs. Barlowe told defendant they would talk about the previous night's incident when she returned and she would tell defendant's father about it when he came home from work that evening and that "her father would never look at [defendant] the same again . . . ." After driving her mother to the party, defendant returned home.

According to defendant's statement to police, Dunlap called her house and told her to bring her mother home from the party or he would kill defendant. She did so, and as they were entering the house through the garage, she heard her mother scream and turned to see Dunlap choking her. She ran and hid and when she returned to the garage, Dunlap had cleaned the garage up with a hose. He then forced defendant to drive either his car or her mother's with her mother's

body to the place where Dunlap attempted to burn the body. Dunlap then took her back home and watched as she got ready for work, then followed her to her father's business and then to work. She later provided additional information, indicating, *inter alia*, that (a) Dunlap had come to the residence for her mother's car, (b) Dunlap had wanted to talk to Mrs. Barlowe about marrying defendant, and (c) defendant had known Dunlap was going to hurt her mother, but not that he would kill her. In her written statement, defendant said:

> Jeremy Dunlap did choke my mother. I didn't call anyone in fear of the thought that I would be guilty of the murder of my mother. I did not know that he was going to attack her. I thought that he had left but he was inside of my garage and he snuck up behind her. I tried to make him let her go. But when he refused I ran away and came back upstairs to him cleaning up the blood at 2:00 pm. and he then grabbed me and forced me to help him. And instead of calling anyone for help I pretended that nothing happened in fear of being found guilty for my mother's death. I am willing to testify against Jeremy Dunlap.

Defendant testified at trial that Dunlap was waiting for her outside her house when she returned from taking her mother to the party. She stated that they discussed the need to talk with Mrs. Barlowe to "straighten things out." To that end, she drove to the party and told her mother in private that Dunlap was at their house and wanted to talk to her. She stated that her mother then told friends that their dog was sick and she had to leave. They drove back to the house and were entering the house through the garage when her mother and Dunlap began arguing behind her. She continued into the house, but then heard her mother scream and turned to see Dunlap choking her mother. She then ran to her room and hid under a blanket. She returned to the garage after an indeterminate period and saw blood everywhere, her mother on the floor, and Dunlap standing over her mother with a flashlight. Dunlap then told her to help him clean up and she did. She also followed his directions in disposing of the body and car. She drove her mother's car with the body in it for a while, but then did not want to be in that car anymore and pulled over and they switched cars. Defendant also testified that Dunlap did everything regarding setting fire to her mother's body and rolling her mother's car off a cliff.

In contrast, Dunlap testified at trial that killing Mrs. Barlowe had been defendant's idea, though they worked out the plan together and he carried out the murder himself. He testified that defendant went

between the house and garage several times while he choked her mother, asking each time she came back out whether "it was done yet." He also stated that after Mrs. Barlowe was on the floor and had at least lost consciousness, he let go of her and defendant asked him, "Are you sure she's dead?" When he responded that he did not know, defendant then went into the house and came back with a heavy flashlight, handed it to him, and said, "Hit her." According to Dunlap, defendant was present in the garage when Dunlap struck Mrs. Barlowe. They then cleaned the garage together, with defendant bringing out towels and the plastic bags that were put over her mother's head and body and hosing off the garage floor herself.

The State also presented testimony by SBI Agent Mike Garrett with respect to his analysis of bloodstains in the Barlowe's garage and on clothing defendant had said she was wearing during the events surrounding her mother's murder. Specifically, Agent Garrett testified to the difference between "transfer" and "spatter" bloodstains, the latter being created when blood is impacted and sprays out from the point of impact. He testified that multiple small stains on the knee and back of the pants which defendant was wearing at the time of the murder tested positive for blood and appeared to be spatter stains. He further testified that they were not consistent with stains that would be created by drops of blood that fell or dripped from above.

---

Although the record on appeal contains twenty-two assignments of error, only three of them have been addressed in defendant's appellate brief. Those assignments of error not addressed in a party's brief are deemed abandoned and will not be reviewed by this Court. N.C.R. App. P. 28(a) (2002). The dispositive issue is whether the trial court erred in denying defendant's motions to continue the trial in order to enable defendant to obtain an expert witness on bloodstain pattern interpretation. For the reasons which follow, we conclude the denial of the motions violated defendant's constitutional rights and entitle her to a new trial.

Defendant argues the denial of her motions to continue prevented her from being able to evaluate Agent Garrett's report, prepare to cross-examine him, or present contradictory evidence with respect to the interpretation of the bloodstains at issue in this case.

[A] motion for continuance is ordinarily addressed to the sound discretion of the trial court. . . . However, if the motion to

continue is based on a constitutional right, the trial court's ruling thereon presents a question of law that is fully reviewable on appeal.

*State v. T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998) (citations omitted). "Whether a defendant bases his appeal upon an abuse of judicial discretion, or a denial of his constitutional rights, to entitle him to a new trial because his motion to continue was not allowed, he must show both error and prejudice." *State v. Moses*, 272 N.C. 509, 512, 158 S.E.2d 617, 619 (1968). If the error amounts to a violation of defendant's constitutional rights, it is prejudicial unless the State shows the error was harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b) (2002); *State v. Gardner*, 322 N.C. 591, 369 S.E.2d 593 (1988); *State v. Cody*, 135 N.C. App. 722, 522 S.E.2d 777 (1999).

The right to present evidence in one's own defense is protected under both the United States and North Carolina Constitutions. As noted by the United States Supreme Court . . . "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."

*State v. Fair*, 354 N.C. 131, 149, 557 S.E.2d 500, 515 (2001) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 308 (1973)), *cert. denied*, —— U.S. ——, 153 L. Ed. 2d 162 (2002); U.S. Const., Amend. V, XIV. In addition, "the right to face one's accusers and witnesses with other testimony is guaranteed by the sixth amendment to the federal constitution, applicable to the states through the fourteenth amendment, and by Article I, sections 19 and 23 of the North Carolina Constitution." *State v. Davis*, 61 N.C. App. 522, 525, 300 S.E.2d 861, 863 (1983). Improper denial of a motion to continue in order to prepare a defense may also constitute violation of a defendant's Sixth Amendment right to effective assistance of counsel. *State v. Rogers*, 352 N.C. 119, 124, 529 S.E.2d 671, 675 (2000).

An inquiry into alleged constitutional error by a trial court in denying a motion to continue requires scrutiny of the record and consideration of the circumstances of the individual case. *Avery v. Alabama*, 308 U.S. 444, 84 L. Ed. 377 (1940). The North Carolina Supreme Court has summarized the analysis applied by federal

courts in reviewing refusals to grant a continuance where a constitutional right is implicated:

> Courts have discussed numerous factors which are weighed to determine whether the failure to grant a continuance rises to constitutional dimensions. Of particular importance are the reasons for the requested continuance presented to the trial judge at the time the request is denied.

> A continuance in a criminal trial essentially involves a question of procedural due process. Implicitly, the courts balance the private interest that will be affected and the risk of erroneous deprivation of that interest through the procedures used against the government interest in fiscal and administrative efficiency.

> When the individual interest at stake is the defendant's life or liberty, the individual interest is especially compelling. An interest such as . . . defendant's life is factored heavily into the analysis.

> On the other side of the scale, the government has an interest in procuring testimony within a reasonable time.

*State v. Roper*, 328 N.C. 337, 349, 402 S.E.2d 600, 607, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991) (citations omitted).

North Carolina courts have followed suit in analyzing similar alleged violations under our state constitution. *Id.* at 352, 402 S.E.2d at 608. Some of the factors considered by North Carolina courts in determining whether a trial court erred in denying a motion to continue have included (1) the diligence of the defendant in preparing for trial and requesting the continuance, (2) the detail and effort with which the defendant communicates to the court the expected evidence or testimony, (3) the materiality of the expected evidence to the defendant's case, and (4) the gravity of the harm defendant might suffer as a result of a denial of the continuance. *See State v. Branch*, 306 N.C. 101, 291 S.E.2d 653 (1982); *State v. Searles*, 304 N.C. 149, 282 S.E.2d 430 (1981); *State v. Smathers*, 287 N.C. 226, 231-32, 214 S.E.2d 112, 115 (1975); *State v. Martin*, 64 N.C. App. 180, 182-83, 306 S.E.2d 851, 852-53 (1983).

In the present case, the alleged offense occurred on 23 September 2000 and evidence log records, as well as Agent Garrett's testimony, indicate the police took custody of the clothing worn by defendant at the time of the murder on 24 September 2000. Defendant

made a request for voluntary discovery on 31 January 2001 that included a request for "any results of . . . tests . . . made in connection with the case . . . together with any physical evidence . . . available to the State." *See* N.C. Gen. Stat. § 15A-903(e) (2002). On 23 April 2001, the State provided defendant with three pages of physical evidence log sheets dated 24 September 2000. One of the attached log sheets contained the entry: "green pants w/ blood stains [from] Eva's bedroom." On 16 May 2001, defendant made a Motion to Compel Discovery and Motion to Produce Exculpatory Evidence, requesting again, *inter alia,* a disclosure of any test results in accordance with G.S. § 15A-903(e). This motion was heard on 24 May 2001, but no disclosure or request was made specifically regarding the green pants. Another Notice of Intent was provided to defendant on 6 September 2001 that dealt with hearsay statements by the victim and defendant.

On 13 September, defendant served a Motion to Continue asserting that the State had, on 10 September, delivered to defense counsel a report containing Agent Garrett's findings from his blood-stain pattern analysis of the green pants and that "since receiving the report . . . [defense counsel had] made diligent efforts to identify potential experts in this field . . . ." Defense counsel explained that the one expert with whom contact had been made would not be able to do the analysis and prepare counsel for cross-examination or be available to give testimony by 19 September, the day trial was scheduled to start. The motion also stated "the potential experts that have been identified by defense counsel are located outside of North Carolina, and there is currently no commercial air traffic in the United States [due to the events of 11 September 2001] by which evidence and documents may be delivered to and from the expert that defendant selects." After hearing the motion on 13 September, the trial court declined to grant a continuance.

On 17 September, defendant submitted a Renewed Motion to Continue, supported with affidavits by defense counsel and three potential expert witnesses. The affidavit by defendant's counsel indicated that he had, on 13 September, presented to the trial court copies of two reports which he had received from the State. One report, prepared on 27 April 2001 and provided to the district attorney, detailed inspection of the crime scene and seizure of items, including the pants, indicating the search and collection of evidence that had taken place on 24 September and 5 October 2000. According to the affidavit and the State's response to the motion to continue,

defendant was provided with this report on 27 or 28 August 2001. The report itself mentions the discovery of small stains on the garage floor "characteristic of impact spatter" and the collection of "[g]reen pants with visible stain." The other report, which defense counsel claims was disclosed on 10 September, was Agent Garrett's blood-stain analysis, indicating the discovery of about 36 stains that "appeared to be blood spatter" on the front right knee and rear of the pants. This report indicated that the analysis had been performed on 20 August 2001 and typed on 21 August, with copies sent to the District Attorney. In his affidavit, counsel went on to detail his efforts to locate an expert witness in the days following 10 September:

> In summary, counsel has consulted with a number of experienced members of the criminal defense bar around the state, and all of those attorneys have identified only three expert witnesses in this subject matter: Marilyn T. Miller, Barton P. Epstein, and Stuart H. James. . . . Two of the witnesses state that they are familiar with the identity of other experts in their field, and that there are none currently in North Carolina outside of law enforcement employees. None of these witnesses is reasonably available to become prepared to testify on behalf of the defendant on such short notice.

Defense counsel also indicated that his law partner had contacted two potential expert witnesses in North Carolina, but neither was qualified to conduct bloodstain pattern analysis. In both the motions and the affidavit, defense counsel urged the importance of an expert witness on this issue in light of the mandatory life sentence without parole for which defendant was at risk. All three of the experts mentioned by counsel submitted affidavits regarding their availability, the earliest of which would have been mid-October 2001 and the latest, November 2001. The resumes each expert attached evidenced extensive experience, publications, and study on the subject.

In the State's Response to the Motion to Continue, the State alleged that defense counsel had in fact been provided with a copy of Agent Garrett's bloodstain pattern analysis on 27 August, although it had been marked as a "draft" then. The contents of the "draft" attached to the State's Response and the finalized report received by defense counsel on 10 September were otherwise identical. Defense counsel's law partner also submitted an affidavit indicating that she had re-contacted the three experts on 17 September to determine whether they could have been available for trial on 19 September had they been contacted on 27 August and all three indicated it would

not have made a difference due to prior commitments. After a hearing in which (1) defense counsel argued specifically that the ability of the defense to rebut the State's blood spatter evidence was critical because it contradicted certain of defendant's statements and (2) the State asserted that if a denial of the motion included a bar against presentation of the State's blood spatter evidence the State would rather not try the case at that time, the trial court denied the motion, stating:

> The Court in its discretion denies the Renewed Motion to Continue and—but I might further add that the so-called reasoning that the Court used in chambers . . . was not that which was asserted in the motion. It was discretionary then, it's discretionary now based on the totality of the circumstances.

Considering all of the factors which our courts have said are relevant to a determination of whether the denial of a motion to continue implicates constitutional guarantees, we are compelled to hold the denial of defendant's motion to continue in this case was error and violated her constitutional rights to confront her accusers, to effective assistance of counsel, and to due process of law. U.S. Const., Amend. V, VI, XIV; N.C. Const. Art. I, §§ 19, 23. It is clear that the blood spatter evidence was critical to the State's case against defendant because it was the only physical evidence potentially placing her at the scene at the time of the murder. Aside from any conclusions the jury might draw from that aspect alone, evidence of the presence of "impact spatter" also is contradictory of defendant's testimony that she was not in the garage during the murder and corroborative of Dunlap's testimony that she was present and, in fact, handed him the flashlight. In a case largely dependent on the credibility of the two, the potential harm to the defense due to the lack of opportunity to refute this evidence by informed cross-examination of Agent Garrett, rebuttal of his testimony by someone qualified to express an opinion, or to provide other explanations for the presence of blood spatter on the pants, is palpable.

Moreover, it does not appear that defendant unreasonably delayed discovery efforts, and even assuming the State is correct in its assertion that defense counsel was provided a draft of Agent Garrett's analysis report on 27 August, defendant has shown that none of the experts contacted by her counsel would have been available for trial even if they had been contacted immediately upon defendant's receipt of the report. If, as claimed by defense counsel, the report was not received until 10 September, the delay between its

receipt and the 13 September motion to continue is not unreasonable, considering the distractions imposed upon nearly all of our citizens and the difficulties likely to have been encountered in contacting and communicating with potential expert witnesses due to the tragic events in New York City and Washington, D.C. on 11 September 2001. Lastly, unlike many cases in which the defendant did not indicate to the trial court the names of witnesses or the substance of testimony they hoped to obtain by virtue of a continuance, *e.g.*, *State v. McCullers*, 341 N.C. 19, 460 S.E.2d 163 (1995), defense counsel in the present case provided such information both orally and in writing. Given the materiality of the issue on which defendant sought expert advice and testimony and the potential penalty faced by defendant if convicted, we can find no sound reason within the record for the denial of her motion for a continuance, and the State has not carried its burden of showing the court's ruling was harmless beyond a reasonable doubt. Because defendant's constitutional rights were violated by the trial court's ruling on this issue, we hold that defendant is entitled to a new trial.

Due to the decision to grant defendant a new trial, we decline to address defendant's second and third arguments.

New trial.

Chief Judge EAGLES and Judge GEER concur.