JACKSON, Judge.
On 24 May 2004, Kenneth Roberson ("defendant") was convicted by a jury of assault with a deadly weapon with intent to kill inflicting serious injury. Defendant was sentenced as a Level II offender in the aggravated range, to a minimum of one hundred and twenty-five months and a maximum of one hundred and fifty-nine months imprisonment in the North Carolina Department of Correction. Defendant now appeals his conviction and sentencing.
On 12 May 2002, the victim, Morris Bennett ("Bennett") was on a street corner in front of a convenience store in Durham, North Carolina, when he was approached by defendant and two other men. Several days prior, Bennett and a friend were on the same street corner when they were shot at from a passing car. Bennett testified at trial that he saw defendant in the car, but could not determine who actually fired the shot. When defendant and Bennett met on the corner on 12 May 2002, Bennett confronted defendant about the shooting, and defendant denied that he had been involved. Bennett then punched defendant in the face. At that moment, a shot was heard, and Bennett was shot in the chest at point-blank range with a Raven .25 semi-automatic handgun. Bennett told his friends and officers, "Kenny shot me." A K9 Officer who arrived on the scene testified that bystanders informed him that the individuals who had shot Bennett had run north on the street. Based on Bennett's statement, and information obtained from bystanders, police determined that the individuals had run to a particular location.
Defendant, who ran from the scene, was found by police at his girlfriend's house a few blocks from where the shooting occurred. When police found defendant, they also found a Raven . 25 handgun under the couch in the apartment where defendant and his friends had just been sitting. Defendant was arrested, read his juvenile rights, and taken to the police station. Defendant waived his Miranda rights by initialing a form indicating the waiver of his right to have a parent, guardian or lawyer present, and his right to remain silent.
Throughout the interrogation, defendant made multiple statements to the police. In defendant's first statement, which he wrote out himself, he indicated that he was not at the corner where the shooting had occurred, but that he merely heard about a shooting as he and his friends were walking to his girlfriend's apartment. After making the statement, defendant was informed by Detective Jackson that he had been identified as being at the scene of the shooting and that his friends also were being interviewed. Defendant then made a second written and verbal statement to Detective Jackson, in which he admitted to being on the corner and getting into an altercation with Bennett. He admitted that he was there when Bennett was shot, but stated that he did not do it.
Following defendant's second statement to Detective Jackson, Detective Addison interviewed defendant. Detective Addison already had interviewed Bennett, spoken with witnesses at the scene, and interviewed one of the other men who was with defendant. During the interview, Detective Addison told defendant that he did not think defendant was being truthful in his statements. At the conclusion of the interview, defendant signed a statement that was written by Detective Addison, who had acted as a scribe and written down defendant's statements. In the statement, defendant admitted to shooting Bennett.
Prior to trial, defendant made a motion to suppress the third statement he made to Detective Addison, on the basis that it was made involuntarily and under duress. The trial court denied defendant's motion to suppress the statement. During the State's case at trial, the State discovered the weapon and shell casings had not been scientifically tested, and immediately sent both the weapon and the casings to the State Bureau of Investigation ("SBI") for testing. Immediately upon receiving the SBI's report, the State presented defense counsel with a copy of the ballistics report. Defendant made two motions to continue based upon the report, both of which were denied.
In his first assignment of error, defendant contends the trial court erred by denying his motion to suppress, and to exclude from evidence, the statement he made to Detective Addison. Defendant contends that the statement was involuntary as it was improperly obtained as a direct result of promises and threats made by the detective.
At the voir dire on defendant's motion to suppress his third statement, defendant testified, along with Detective Addison and Detective Jackson. Defendant's testimony conflicted with that of both detectives. Detective Addison and Detective Jackson both testified that defendant was properly Mirandized, he waived his rights, and he never asked for an attorney, parent, or guardian to be present. Both detectives stated that at no point during their interviews of defendant did they threaten, swear or yell at him, or promise him anything. Detective Addison stated defendant was not in handcuffs at any time once he was placed in the interview room. Both Detective Addison and Detective Jackson stated that at all times defendant appeared coherent, understood their questions, was able to respond clearly, was willing to speak with them, and did not appear to be under the influence of any drugs or other substances.
Detective Jackson apprised defendant of his Miranda rights as soon as defendant arrived at the police station. He used a juvenile Miranda form, since defendant was over the age of fourteen and under eighteen. As Detective Jackson read each of defendant's rights and asked if defendant understood them, defendant initialed the form indicating that he understood his rights. He also initialed the portion of the form indicating that he wanted to talk with the officers. The following statement appeared at the bottom of the form:
I do wish to answer questions now without a lawyer, parent, guardian, or custodian here with me. My decision to answer questions now is made freely and is my own choice. No one has threatened me in any way or promised me any special treatment. Because I have now decided to answer questions, I am signing my name below.
Defendant then signed and dated the Miranda form.
Detective Addison's statements on voir dire differ substantially from those of defendant on voir dire. Detective Addison stated that when he interviewed defendant, he told defendant that he did not think defendant was being truthful, that witnesses from the scene had identified him as the shooter, and his friends had made statements implicating him as the shooter. Detective Addison told defendant that if Bennett were to die, it would be up to the District Attorney's office to decide with what to charge him. He then discussed the repercussions of being convicted of murder in North Carolina, including the various types of punishment that could be imposed. Detective Addison stated that at no point during the interview did he threaten defendant or promise defendant a lesser charge if he would say the shooting was done in self-defense or if defendant would sign a statement admitting to the shooting. He also stated that at no point was defendant in handcuffs once he got to the interview room, nor was he handcuffed to the chair. Detective Addison stated that defendant began to tell him what happened at the scene, at which point the detective acted as a scribe and wrote down defendant's statement. Detective Addison stated that when defendant was done giving his statement, he read the statement back to defendant, who did not make any corrections or ask any questions. Defendant then signed the statement and the interview ended.
Defendant's recitation of the events surrounding his interview with Detective Addison are very different. Defendant stated that while he was in the interview room, he made multiple requests for officers to call his mother, all of which were denied. He stated his requests to use the rest room also were denied, and that at all times while he was in the interview room he was handcuffed to the chair. Defendant stated that when Detective Addison came in, the detective told him that Bennett was going to die and defendant would get a lethal injection. He also stated that the detective came into the room with a statement already written out, and told defendant to sign it and say he shot Bennett in self-defense, and that he would get less time in prison. Defendant stated that at this point, he felt he was going to go to jail, and he felt like "since I'm going to jail anyway, I might as well sign the paper." Defendant stated he never read the statement, the detective never reviewed it with him, and the statement was not comprised of his statements at all. When ruling on a motion to suppress a statement for lack of voluntariness, the trial court must determine whether the State has met its burden of showing, by a preponderance of the evidence, that the defendant's statement was given freely, voluntarily, and knowingly. "Findings of fact made by a trial judge following a voir dire hearing on the voluntariness of a confession are conclusive upon this Court if the findings are supported by competent evidence in the record." State v. Hyde, 352 N.C. 37, 44, 530 S.E.2d 281, 287 (2000), cert. denied, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001) (citation omitted). An appellate court may not set aside or modify these findings if they are supported by competent evidence. Id.; State v. Rook, 304 N.C. 201; 283 S.E.2d 732 (1981). This remains true even when the evidence presented in voir dire is conflicting. Id.
Following the voir dire, the trial court made the following findings of fact:
COURT: Based on the evidence presented at the suppression hearing, there is evidence from which a reasonable fact-finder can conclude that defendant understood his rights pursuant to Miranda, and that defendant knowingly waived those rights.
The Court makes a further finding that the defendant signed a statement implicating himself, and that this statement - that a reasonable fact-finder could find that this statement was signed of the defendant's own free will, knowingly and voluntarily made.
Based on the testimony presented during the suppression hearing, we conclude the trial court's findings were amply supported by competent evidence in the record.
Upon a finding that the trial court's findings of fact were supported by competent evidence in the record, we must determine whether the trial court's conclusions of law are supported by its findings. Hyde, 352 N.C. at 45, 530 S.E.2d at 288. "The trial court's conclusion of law that defendant's statements were voluntarily made is a fully reviewable legal question." Id.; see State v. Hardy, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994). In determining the voluntariness of a defendant's statement, the court must apply a totality of the circumstances test. Id. The court must consider a number of factors including:
whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.
Id. (quoting Hardy, 339 N.C. at 222, 451 S.E.2d at 608).
Although the two sides of the story presented to the trial court differed dramatically, the trial court's findings were supported by the testimony of both detectives. The detectives testified that from the time defendant arrived at the station until the time he was taken to the magistrate's office was only a matter of two hours. His Miranda rights were honored at all times, and at no time did defendant invoke his right to counsel or to call a parent or guardian. Defendant was not threatened with force or with punishment if he chose not to speak with police or make statements. He appeared nervous at times, but was cooperative at all times, and did not appear to be confused or scared of the detectives.
Based on the totality of the circumstances, we hold that the trial court's conclusions of law are supported by the findings of fact, and the trial court did not err in concluding defendant's statement was made voluntarily.
Defendant next asserts the trial court erred in denying his request for a continuance of his trial so that he could have the weapon and fired shell casing, used as evidence by the State, tested by his own ballistics expert.
In State v. Barlowe, this Court held that "a motion for continuance is ordinarily addressed to the sound discretion of the trial court. . . . However, if the motion to continue is based on a constitutional right, the trial court's ruling thereon presents a question of law that is fully reviewable on appeal." 157 N.C. App. 249, 252-53, 578 S.E.2d 660, 662, disc. review denied, 357 N.C. 462, 586 S.E.2d 100 (2003) (quoting State v. T.D.R., 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998)). When a defendant's appeal is based "upon an abuse of judicial discretion, or a denial of his constitutional rights, to entitle him to a new trial because his motion to continue was not allowed, he must show both error and prejudice." Id. at 253, 578 S.E.2d at 662 (quoting State v. Moses, 272 N.C. 509, 512, 158 S.E.2d 617, 619 (1968)). When the error committed constituted a violation of the defendant's constitutional rights, it will be found to be prejudicial unless the State can show the error was harmless beyond a reasonable doubt. Id. at 253, 578 S.E.2d at 662-63; N.C. Gen. Stat. § 15A-1443(b) (2004).
Both the United States and the North Carolina Constitutions protect a defendant's right to present evidence in his own defense. The accused's right not only includes "the right to a fair opportunity to defend against the State's accusations," but also the right to "confront and cross-examine witnesses and to call witnesses in one's own behalf." Id. at 253, 578 S.E.2d at 663 (citations omitted). When this Court reviews a trial court's alleged constitutional error in denying a motion to continue, the review involves a case by case review of the record and determination. Id. Our courts have recognized various factors which must be considered in determining whether a trial court erred in denying a motion to continue. Those factors include:
(1) the diligence of the defendant in preparing for trial and requesting the continuance, (2) the detail and effort with which the defendant communicates to the court the expected evidence or testimony, (3) the materiality of the expected evidence to the defendant's case, and (4) the gravity of the harm defendant might suffer as a result of a denial of the continuance.
Id. at 254, 578 S.E.2d at 663.
In the instant case, defense counsel requested a continuance on 19 May 2004, two days after receiving a copy of the ballistics expert's report, and this request was denied. The State presented the testimony of a firearms examiner from the State Bureau of Investigation, and at a break in his testimony, defense counsel renewed the motion to continue two days later, stating that she had found a ballistics expert who would not be able to review the State expert's report and testify until 21 May 2004. Defense counsel requested a continuance until 21 May 2004, when her expert would be available to testify. The trial court denied this request as well.
In requesting the continuance, defense counsel stated she had not spoken with the ballistics expert about the details of defendant's case, nor could she provide a forecast for the court as to the substance of the expert's testimony. She was unable to show the court how the expert's testimony would in any way contradict the testimony of the State's expert. Defendant asserts that by denying the motion to continue, the trial court denied him an opportunity to cross-examine the State's ballistics expert effectively. This argument fails, however, in that nothing in the court's denial of the continuance prevented defense counsel from speaking with any ballistics experts in order to prepare for cross-examination. In addition, defendant did not begin to present evidence until 20 May 2004, so defendant had ample time to present his own ballistics expert, as his case did not conclude until 24 May 2004 - several days after the date defense counsel had indicated defendant's ballistics expert would be ready and available to testify.
Therefore, we hold that defendant was not prejudiced by the trial court's denial of the motion to continue, and further that the trial court did not abuse its discretion. Defendant had ample opportunity to present his witness and evidence, and to cross-examine the State's witness effectively.
Defendant next contends his Sixth Amendment right to a jury trial was violated, when the trial court imposed a sentence in the aggravated range based on facts which were not admitted by him or found by a jury beyond a reasonable doubt, in violation of the U.S. Supreme Court's ruling in Blakely v. Washington, 542 U.S. 296, 159 L. Ed. 2d 403 (2004).
Defendant also argues that the imposition of an aggravated sentence based on an aggravating factor not charged in the indictment also violated his Sixth Amendment rights. Our courts have held repeatedly that aggravating factors need not be alleged in the indictment. See, State v. Allen, 359 N.C. 425, 438, 615 S.E.2d 256, 265 (2005); State v. Blackwell, 359 N.C. 814, 819-20, 618 S.E.2d 213, 217 (2005); State v. Speight, 359 N.C. 602, 607, 614 S.E.2d 262, 265 (2005). Therefore, defendant's argument on this issue fails.
In Blakely v. Washington, the United States Supreme Court held that the "'statutory maximum' for any offense is ' the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.'" State v. Harris, 166 N.C. App. 386, 394, 602 S.E.2d 697, 702 (2004) (quoting Blakely, 542 U.S. at 303, 159 L. Ed. 2d at 413 (2004)). The Blakely Court further explained that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely, 542 U.S. at 303-04, 159 L. Ed. 2d at 413-14. "Thus, any additional findings that may be used to increase a defendant's sentence, but not found by the jury, are otherwise made in violation of defendant's Sixth Amendment Right to trial by jury." Harris, 166 N.C. App. at 394, 602 S.E.2d at 702 (citing Blakely, 542 U.S. at 305, 159 L. Ed. 2d at 414-15).
Our courts have adopted the holding in Blakely, and applied it to our sentencing scheme and a trial court's enhancement of a defendant's sentence by finding aggravating factors. State v. Allen, 166 N.C. App. 139, 601 S.E.2d 299 (2004), aff'd in part and modified in part, 359 N.C. 425, 615 S.E.2d 256 (2005). In Allen our Court held, pursuant to Blakely, that the defendant was denied his Sixth Amendment right to a jury trial when the trial court unilaterally found an aggravating factor. Allen, 166 N.C. App. at 150, 601 S.E.2d at 306. In State v. Harris, this Court followed Allen and Blakely, in holding that pursuant to Allen and Blakely, should the court at any new trial use a factor in aggravation to impose a sentence beyond the presumptive term for which defendant has been found guilty, the fact must be found by the following: beyond a reasonable doubt by the jury, stipulated to by defendant, or defendant shall have waived his right to a jury such that judicial fact finding would be appropriate.
State v. Harris, 166 N.C. App. at 394-95, 602 S.E.2d at 702.
In the instant case, defendant was sentenced in the aggravated range, after the trial court found the aggravating factor that:
The Offense was committed for the benefit of, or at the direction of, any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, and the defendant was not charged with committing a conspiracy.
Defendant did not stipulate to this fact, nor was it presented to the jury. Therefore, the trial court made this finding of fact on its own initiative, and did so in violation of defendant's Sixth Amendment right to a jury trial.
No error at trial, remand for resentencing.
Judges McGEE and McCULLOUGH concur.
Report per Rule 30(e).