STATE OF NORTH CAROLINA v. RICHARD LIONEL COOK

No. COA06-1355

(Filed 3 July 2007)

**1. Appeal and Error— preservation of issues—failure to argue**

There was no error in either the verdicts returned, judgment entered, or sentences imposed for defendant's convictions for assault with a deadly weapon inflicting serious injury because defendant failed to contest the validity of his assault convictions.

**2. Discovery— blood alcohol concentration—retrograde extrapolation opinion—disclosure of basis**

A second-degree murder case is remanded to the trial court for a determination of whether its denial of defendant's motion to continue was harmless beyond a reasonable doubt because the record and transcripts are silent on whether defendant possessed knowledge of or if the State disclosed all the information in its possession and used by the State's witness in making his calculations regarding defendant's blood alcohol concentration.

Judge WYNN dissenting.

Appeal by defendant from judgments entered 22 February 2006 by Judge J.B. Allen, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 22 May 2007.

*Attorney General Roy Cooper, by Special Counsel Isaac T. Avery, III, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Constance Widenhouse, for defendant-appellant.*

TYSON, Judge.

Richard Lionel Cook ("defendant") appeals from judgment entered after a jury found him to be guilty of one count of second-degree murder and two counts of assault with a deadly weapon inflicting serious injury. We find no error in part and remand in part with instructions.

## I. Background

Gene Mullis ("Mullis") has known defendant since 1994 and hired him to work temporarily at Triad Coatings, a distributor of

retail and wholesale paint products. On the evening of 28 October 2004, defendant and Mullis made arrangements for friends and customers to come to the shop and play cards. At approximately 5:00 p.m., defendant left the shop, went to the ABC store, and returned with a bottle of vodka.

By the end of the card game, it was apparent to Mullis that defendant had been drinking, but he did not know the volume of alcohol defendant consumed that evening. After the card game ended, Mullis planned to drive defendant to a Days Inn hotel where he resided. Mullis offered to drive because defendant had been drinking and "had a terrible sense of directions."

As Mullis secured the store for the night, defendant walked out of the back door. Another individual present at the store said he heard a car start. Mullis walked outside, saw defendant sitting in a car, and waved his arms, but defendant drove away.

Lieutenant Robert Wilborne of the Alamance County Sheriff's Department ("Lieutenant Wilborne") was patrolling Interstate 40/85 on the evening of 28 October 2004. At approximately 11:34 p.m. Lieutenant Wilborne stopped a 1989 Chevrolet Beretta with three occupants between exits 141 and 143 for failing to display an illuminated license tag light. Lieutenant Wilborne issued the driver, Adan Guerrero Rosales ("Adan"), a citation for failure to possess a valid driver's license. No occupant inside the vehicle possessed a valid driver's license. Lieutenant Wilborne instructed Adan to drive to the next exit and call someone who possessed a valid license to drive. The occupants requested they be permitted to remain on the shoulder of the interstate and to call someone to come get them. Lieutenant Wilborne consented and left the scene.

Adan testified he was stopped and cited for driving without a license on 28 October 2004. After receiving the citation, Adan sat in his car with his brother, Sergio Guerrero Rosales ("Sergio"), and Anibal Amaya Guevara ("Guevara"). Sergio sat behind the front passenger seat and Guevara sat behind the driver's seat. Adan was talking on his cell phone when his car was struck by defendant's vehicle. The force of the impact knocked Adan unconscious. Sergio suffered a fractured bone in his back and had "ground up blood" in his stomach. Guevara was killed in the collision. The accident occurred at approximately 12:05 a.m.

Alamance County paramedics Kyle Buckner ("Buckner") and Mike Childers ("Childers") responded to the scene. Childers

smelled alcohol inside defendant's car and he asked if defendant had been drinking. Defendant responded he "had two beers." Buckner also spoke with defendant as he was being transported in the ambulance. He testified defendant's breath smelled of alcohol and defendant "dozed off" while being transported in the ambulance.

After arrival at UNC Hospitals in Chapel Hill, defendant was diagnosed with a lacerated spleen and fractured ribs. Defendant was administered morphine in the ambulance by the paramedics, and two subsequent doses of morphine at the hospital between the time he arrived and 3:00 a.m. A blood sample was drawn from defendant at the hospital at 1:38 a.m. and analyzed at 1:50 a.m. The test results showed defendant's blood alcohol concentration to be .059.

Defendant's blood also tested positive for amphetamines, marijuana and opiates. The treating physician testified that the presence of opiates "certainly can be explained by [the morphine]," but no medicines would account for the amphetamine or marijuana. Defendant admitted at the hospital that he had "been in rehab many times." State Trooper Clint Carroll ("Trooper Carroll") investigated the accident and obtained a blood sample drawn from defendant at 3:00 a.m., which showed defendant's blood alcohol concentration level at that time to be .03.

Defendant was indicted for second-degree murder, felony death by motor vehicle, two counts of assault with deadly weapon inflicting serious injury, reckless driving, and driving while impaired on 24 January 2006. The State did not proceed on the charges of felony death by motor vehicle, reckless driving, and driving while impaired.

## A. State's Evidence

The State presented evidence from several witnesses to the accident. Truck driver John Talbot ("Talbot") was driving on Interstate 40 through Alamance County on the evening of 28 October 2004. Around the 143 or 144 mile marker, Talbot observed a white car "right on [his] back bumper." Talbot moved onto the right shoulder and the car moved onto the right shoulder as well. Talbot testified the white car drove quickly around his truck and was "drifting." Talbot estimated the white car was traveling between seventy-five to eighty miles per hour. Talbot "radioed" the truck driver ahead of him to "watch out" because the driver of the white car was "either asleep or drunk." After the white car passed Talbot's truck, he observed it swerve to the left, which caused a "tango truck" to swerve to avoid

being hit. A few seconds later, Talbot saw the white car "upside down in the middle of the [interstate]."

Andrew Brady ("Brady") was also driving on Interstate 40/85 on the evening of 28 October 2004. He testified that he saw a white car "coming toward [him] from the left, far lanes [sic] and cross[] over in front of [him]," drift onto the shoulder of the road, "jerk some," and collide with another vehicle. Brady testified that the car "shot up in the air and flipped several times" before coming to rest on its hood.

Timothy Mitchell ("Mitchell") lives in a house facing Interstate 40/85. On the evening of 28 October 2004 Mitchell observed a police car stop a purple car. The police car left and the purple car remained parked on the shoulder of the highway. Mitchell heard a crash and observed a white car flip in the air.

Paul Glover ("Glover"), an employee of the North Carolina Department of Health and Human Services, qualified as an expert witness on blood analysis and the effects of alcohol and drugs on human performance over defendant's objections. Glover testified defendant's alcohol elimination rate was .0147, based solely on the two "snapshot" tests of defendant's blood at 1:38 a.m. and 3:00 a.m. respectively, and over defendant's continuing objections. Based upon the results of the 1:38 a.m. hospital and 3:00 a.m. SBI blood alcohol analyses, Glover opined that at the time of the collision, 12:05 a.m., defendant's blood alcohol concentration would have been .07, less than the .08 presumptive level of impairment. N.C. Gen. Stat. § 20-138.1(a)(2) (2005).

Glover further testified the combined presence of alcohol, amphetamines, and marijuana would have a "synergistic effect," and presence of all three substances in a person's blood would cause a more impairing effect on a person than any one of the substances alone. The trial court instructed the jury to find defendant guilty of second-degree murder if they found the State had proved beyond a reasonable doubt that, *inter alia*, defendant was driving while impaired at the time of the collision and Guevara's death.

The jury found defendant guilty of second-degree murder, assault with deadly weapon inflicting serious injury on Adan, and assault with deadly weapon inflicting serious injury on Sergio. Defendant was sentenced in the presumptive range to a minimum of 176 and a maximum of 221 months imprisonment for the second-degree murder conviction and consecutive terms of a minimum of 27 months and a

maximum of 42 months imprisonment for each assault with a deadly weapon inflicting serious injury conviction. Defendant appeals.

## II. Issues

Defendant argues the trial court erred in: (1) denying defendant's motion to continue; (2) precluding *ex mero motu* defendant's cross examination regarding Mullis's personal knowledge of the side effects of the chemicals to which defendant was exposed at work on 28 October 2004; (3) allowing the State to refresh the recollection of Talbot and Buckner; and (4) admitting Trooper Carroll's opinion testimony that defendant was impaired at the time the collision occurred.

## III. Assault With A Deadly Weapon Inflicting Serious Injury

[1] We note initially defendant's argued assignments of error do not challenge either of his convictions for assault with a deadly weapon inflicting serious injury. All four issues before us argue whether evidence and testimony that defendant was appreciably impaired at the time of the collision were properly admitted or denied. As defendant does not contest the validity of his assault convictions, we hold there is no error in either the verdicts returned, judgments entered, or sentences imposed for defendant's convictions for assault with a deadly weapon inflicting serious injury.

## IV. Motion to Continue

[2] Defendant argues the trial court erred in denying his motion to continue.

### A. Standard of Review

Although a motion for a continuance is ordinarily addressed to the discretion of the trial judge and is reviewable only upon a showing of an abuse of discretion, when the motion is based on a constitutional right the ruling of the trial judge is reviewable [de novo] on appeal as a question of law.

*State v. Maher*, 305 N.C. 544, 547, 290 S.E.2d 694, 696 (1982). Defendant's argument is based on his constitutional right to due process and is reviewable *de novo* as a question of law. *Id.*

"The denial of a motion to continue, even when the motion raises a constitutional issue, is grounds for a new trial only upon a showing by the defendant that the denial was erroneous and also that his case was prejudiced as a result of the error." *State v. Branch*, 306 N.C. 101,

104, 291 S.E.2d 653, 656 (1982). "If the error amounts to a violation of defendant's constitutional rights, it is prejudicial unless the State shows the error was harmless beyond a reasonable doubt." *State v. Barlowe*, 157 N.C. App. 249, 253, 578 S.E.2d 660, 662-63, *disc. rev. denied*, 357 N.C. 462, 586 S.E.2d 100 (2003).

### B. Retrograde Extrapolation

The State notified defendant's counsel on 15 February 2006 that it intended to call Glover to testify as an expert witness and provided defendant with Glover's *curriculum vitae*. On Friday afternoon, 17 February 2006, the State provided defendant with a one-page report prepared by Glover entitled "Retrograde Extrapolation of Alcohol Concentrations," dated 13 January 2006. This report purportedly consisted of calculations Glover had used to base his opinion of defendant's blood alcohol concentration at the time of the accident. The report opined defendant's blood alcohol concentration at the time of the collision was .08, based upon defendant's assumed blood alcohol elimination rate of .0172.

Defense counsel filed a written motion to continue on Friday afternoon, after receipt of Glover's report. Defendant's motion to continue was heard prior to trial on Monday, 20 February 2006. Defense counsel restated the allegations contained in his motion and explained, that despite his extensive trial experience, he was unfamiliar with this type of testimony and unable to retain an expert over the weekend to review Glover's retrograde extrapolation report and to possibly testify for the defense. The trial court reserved ruling until such time Glover's testimony was proffered, and the trial proceeded. When Glover was called as a State's witness, the trial court held a *voir dire* hearing and, over defendant's continuing objections, permitted Glover to testify.

Expert opinion of the rate at which a body eliminates alcohol has been admitted, either without defendant's specific objection or subject to a proper relevancy foundation, as tending to show a driver's blood alcohol concentration at the time of an accident, after a blood sample was obtained from the driver subsequent to the accident. *State v. Catoe*, 78 N.C. App. 167, 169-70, 336 S.E.2d 691, 692 (1985) (defendant failed to specifically object to the retrograde extrapolation opinion at trial; "[o]f course, the usual constraints of relevance continue to apply."), *disc. rev. denied*, 316 N.C. 380, 344 S.E.2d 1 (1986); *State v. Taylor*, 165 N.C. App. 750, 756, 600 S.E.2d 483, 488 (2004) (requiring a proper foundation for Glover's retrograde extrap-

olation testimony when Glover used the average blood alcohol elimination rate). *See also State v. Wood,* 174 N.C. App. 790, 793, 622 S.E.2d 120, 122 (2005) ("The State laid no foundation to show the relevancy of [the retrograde extrapolation] testimony.")

At trial, Glover testified he calculated defendant's blood alcohol concentration at the time of the accident by determining the change in defendant's blood alcohol concentration based on the elapsed time between the two blood samples drawn at 1:38 a.m. and 3:00 a.m. Based upon the difference in these two blood alcohol concentrations results and the elapsed time, Glover calculated defendant's alcohol elimination rate to be .0147 per hour. Glover opined, over defendant's objection, that based upon defendant's alcohol elimination rate, defendant's blood alcohol level at the time of the accident was .07.

## C. Duty to Disclose

The record shows defendant filed two discovery motions, one on 19 January 2005 and the other on 23 March 2005. These motions specifically sought, *inter alia:* (1) "[a]ll memoranda, documents, and reports of all law enforcement officers connected with [the case] . . ." and (2) "[r]esults of all reports of any scientific tests or experiments or studies made in connection with the . . . case and all copies of such reports."

N.C. Gen. Stat. § 15A-903 provides:

(a) Upon motion of the defendant, the court must order the state to:

. . . .

(2) Give notice to the defendant of any expert witnesses that the State reasonably expects to call as a witness at trial. Each such witness shall prepare, and the State shall furnish to the defendant, a report of the results of any examinations or tests conducted by the expert. The State shall also furnish to the defendant the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion. The State shall give the notice and furnish the materials required by this subsection *within a reasonable time* prior to trial, as specified by the court.

N.C. Gen. Stat. § 15A-903(a)(2) (2005) (emphasis supplied). N.C. Gen. Stat. § 15A-907 (2005) provides that if the State:

discovers prior to or during trial additional evidence or witnesses, or decides to use additional evidence or witnesses, and the evidence or witness is or may be subject to discovery or inspection under this Article, the *party must promptly notify the attorney* for the other party of the existence of the additional evidence or witnesses.

N.C. Gen. Stat. § 15A-907 (2005) (emphasis supplied).

In *State v. Branch*, our Supreme Court stated:

The constitutional guarantees of due process, assistance of counsel and confrontation of witnesses unquestionably include the right of a defendant to have a reasonable time to investigate and prepare his case. No precise time limits are fixed, however, and what constitutes a reasonable length of time for the preparation of a defense must be determined upon the facts of each case.

306 N.C. at 104-05, 291 S.E.2d at 656. In *State v. Castrejon*, this Court stated:

Last minute or "day of trial" production to the defendant of discoverable materials the State intends to use at trial is an unfair surprise and may raise constitutional and statutory violations. We do not condone either non-production or a "sandbag" delivery of relevant discoverable materials and documents by the State. *See State v. Payne*, 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990) ("[T]he purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate."), *cert. denied*, 498 U.S. 1092, 111 S. Ct. 977, 112 L. Ed. 2d 1062 (1991).

179 N.C. App. 685, 695, 635 S.E.2d 520, 526-27 (2006) *disc. rev. denied*, 361 N.C. 222, 642 S.E.2d 709 (2007).

### D. Prejudice

Under our standard of review, defendant must show "that the denial was erroneous and also that his case was prejudiced as a result of the error." *Branch*, 306 N.C. at 104, 291 S.E.2d at 656. In *State v. Fuller*, the defendant appealed from her conviction for driving while impaired and argued the trial court erred in denying her motion to prevent the State's expert witness from testifying. 176 N.C. App. 104, 107, 626 S.E.2d 655, 657 (2006). Defendant asserted the State did not "promptly notify" her of its intention to call the expert within a "reasonable time" in order to allow her to procure a rebuttal witness. *Id;*

N.C. Gen. Stat. §§ 15A-907, 903(a)(2) (2005). In *Fuller*, the State served notice on defendant the morning of the defendant's trial, that it would be calling an expert witness to opine to defendant's probable blood alcohol content at the time she was driving, by using an average retrograde extrapolation rate. 176 N.C. App. at 107, 626 S.E.2d at 657. We held the trial court did not err in admitting an opinion of the defendant's probable blood alcohol content at the time she was driving "in light of defendant's clear understanding of the importance of [the] evidence to the State's case against her and its longstanding acceptance in the courts of this state." *Id.* at 108, 626 S.E.2d at 658.

Here, defendant was indicted on 14 February 2005. One of the charges listed in the indictments is driving while impaired. Defendant went to trial over a year later, on 20 February 2006. Defendant's trial counsel acknowledged that he had defendant's medical records from the hospital, which showed a blood test being drawn and that defendant had a blood alcohol concentration of .059 at 1:38 a.m.

Nothing in the record or transcripts shows that either defendant or defense counsel was aware a second sample was drawn or that the results of that sample showed defendant's blood alcohol level was .03 at 3:00 a.m. The 3:00 a.m. blood sample was apparently taken from defendant by hospital personnel and transferred directly to Trooper Carroll. Nothing in the record shows the blood draw or that defendant's .03 blood alcohol concentration was recorded in his medical records or provided to defendant or his attorney prior to trial.

Glover used the difference between the results of the 1:38 a.m. and 3:00 a.m. blood draws to opine that defendant's specific blood alcohol elimination rate was .0147 per hour rather than the average human blood alcohol elimination rate of .0165 per hour that Glover testified to in *State v. Taylor.* 165 N.C. App. at 752, 600 S.E.2d at 486 ("The alcohol elimination rate used by Glover in this calculation was an average rate of .0165.").

Under *Fuller*, defendant could be reasonably expected to anticipate the State might produce retrograde extrapolation evidence tending to show defendant's blood alcohol concentration at the time of the crash. 176 N.C. App. at 108, 626 S.E.2d at 658. However, without a showing defendant knew of the second blood sample or that its results showed his blood alcohol concentration was .03 at 3:00 a.m., defendant could not reasonably foresee the State would, based on the difference between the two samples, use his specific blood alcohol elimination rate of .0147 rather than the "average rate" of

.0165, or review the second test and obtain rebuttal testimony in his client's defense.

Furthermore, Glover's report, provided to defendant on the Friday afternoon before trial the following Monday, shows defendant's blood alcohol elimination rate as .0172. Glover testified at trial that defendant's blood alcohol elimination rate was .0147. The alcohol elimination rate used in the calculations causes the estimation of defendant's blood alcohol level, at any given time, to vary widely.

### E. Remand

Whether the trial court committed constitutional or statutory error in denying a defendant's motion to continue is determined on a case-by-case basis. *State v. Barlowe*, 157 N.C. App. 249, 253, 578 S.E.2d 660, 663 (2003) (citing *Avery v. Alabama*, 308 U.S. 444, 84 L. Ed. 377 (1940)).

The record and transcripts before us are silent on whether the defendant possessed knowledge of or if the State disclosed all the information in its possession and used by Glover in making his calculations, as it was constitutionally and statutorily required. On this record, we are unable to determine whether defendant was prejudiced by the State's delivery of Glover's retrograde extrapolation report dated 13 January 2006 to defendant on the Friday afternoon, 17 February 2006, prior to defendant's trial the following Monday morning, and whether the trial court's denial of defendant's motion to continue was harmless beyond a reasonable doubt. *Fuller*, 176 N.C. App. at 107, 626 S.E.2d at 657.

We remand this case to the trial court for a hearing and determination of: (1) whether defendant or defense counsel, prior to 17 February 2006, had knowledge that an additional blood sample was taken from defendant at 3:00 a.m. which showed defendant's blood alcohol concentration to be .03 at that time; (2) when, prior to 17 February 2006, defendant or defense counsel became aware a second blood sample was taken at 3:00 a.m. that showed defendant's blood alcohol concentration to be .03; (3) the dates the State provided the defendant's blood test results to Glover and procured Glover as an expert witness to testify in this trial; (4) when Glover calculated and prepared and when the State received possession of Glover's retrograde extrapolation report; (5) whether Glover was listed as an expert witness in the pre-trial order or any other witness list required to be disclosed by the State to defendant pursuant to

N.C. Gen. Stat. § 15A-903(a)(2); (6) the date defense counsel received possession of any pre-trial order or other State's witness list; (7) whether the delivery of Glover's report to defendant's trial counsel at 2:00 p.m. on the Friday prior to trial the following Monday morning occurred "within a reasonable time prior to trial" pursuant to N.C. Gen. Stat. § 15A-903(a)(2) and whether the State otherwise complied with N.C. Gen. Stat. § 15A-903(a)(2), the other provisions of N.C. Gen. Stat. § 15A-903, the provisions of N.C. Gen. Stat. § 15A-907, i.e., if the State "promptly notif[ied] the attorney for the other party of the existence of the additional evidence or witnesses;" and (8) whether the State acted in conformity with the constitutional provisions set forth in *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963) and *State v. Smith*, 337 N.C. 658, 662, 447 S.E.2d 376, 377-78 (1994). Upon remand, the trial court shall hold a hearing, receive evidence, and make findings of fact and conclusions of law regarding each of these factors.

## V. Conclusion

Defendant failed to assign error to his two assault with a deadly weapon inflicting serious injury convictions. We find no error in these convictions.

All of defendant's remaining assignments of error challenge the admission or exclusion of evidence relating to his conviction for second degree murder. These remaining assignments of error are preserved until after the trial court's hearing and entry of order on remand.

This case is remanded to the trial court for further proceedings consistent with this opinion.

No error in part and remanded in part with instructions.

Judge CALABRIA concurs.

Judge WYNN dissents in a separate opinion.

WYNN, Judge, dissenting.

I respectfully dissent, observing a well-established rule of appellate law:

Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same

court is bound by that precedent, unless it has been overturned by a higher court. . . . While we recognize that a panel of the Court of Appeals may disagree with, or even find error in, an opinion by a prior panel and may duly note its disagreement or point out that error in its opinion, the panel is bound by that prior decision until it is overturned by a higher court.

*State v. Jones*, 358 N.C. 473, 487, 598 S.E.2d 125, 133-34 (2004) (internal quotation and citation omitted).

In *State v. Fuller*, this Court held that the trial court did not abuse its discretion by denying the defendant's motion to prevent the State from presenting extrapolation evidence from the same expert witness at issue in the instant case. 176 N.C. App. 104, 107-08, 626 S.E.2d 655, 657-58 (2006). The defendant in *Fuller*, as here, argued that she had insufficient time to procure a rebuttal witness. We noted "defendant's clear understanding of the importance of this evidence to the State's case against her and its longstanding acceptance in the courts of this state." *Id.* at 108, 626 S.E.2d at 658. Indeed, such evidence has been offered in North Carolina since 1985. *State v. Catoe*, 78 N.C. App. 167, 169-70, 336 S.E.2d 691, 693 (1985), *disc. review denied*, 316 N.C. 380, 344 S.E.2d 1 (1986); *see also State v. Taylor*, 165 N.C. App. 750, 752-58, 600 S.E.2d 483, 486-89 (2004); *State v. Davis*, 142 N.C. App. 81, 89-90, 542 S.E.2d 236, 241, *disc. review denied*, 353 N.C. 386, 547 S.E.2d 818 (2001).

Here, although the record may not contain definitive evidence as to whether Defendant had notice of the results of the three a.m. blood test, neither is there any suggestion—by either the State or Defendant himself, in his arguments to this Court—that the trial court had incomplete information as to Defendant's notice and degree of knowledge. In light of the facts at issue in this case, Defendant unquestionably had notice that the State would offer evidence as to his alleged impairment and blood alcohol content. The "longstanding acceptance" of extrapolation evidence likewise should have put Defendant on notice that the State would use his blood tests to estimate his blood alcohol content at the time of the crash. The sole surprise was the name of the expert, which should not have precluded Defendant from preparing a rebuttal.[1]

---

1. I note, too, that even assuming *arguendo* that it was an abuse of discretion for the trial court to deny the motion to continue, such error was not prejudicial to Defendant. The expert testimony at trial was actually more beneficial to Defendant, as the expert stated that his blood alcohol content would have been 0.07 (and below the legal limit), rather than the 0.08 stated in his report. Moreover, the State had other evi-

I see no meaningful distinction between the facts in the instant case and those of *Fuller*. As such, our decision should be controlled by our prior precedent. *Jones*, 358 N.C. at 487, 598 S.E.2d at 133-34. I would therefore affirm the trial court's denial of the motion to continue, as well as reach the merits of Defendant's other arguments.

dence against Defendant, including testimony as to his earlier blood tests, paramedic testimony that the car smelled of alcohol, and witness testimony that he was driving erratically immediately prior to the accident, that would have supported the jury's verdicts; the issue of impairment did not need to be proven as an element of any of the crimes of which he was convicted.