IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-191-2

Filed: 1 September 2020

Durham County, Nos. 15CRS02048, 2049, 55891

STATE OF NORTH CAROLINA

v.

DMARLO LEVONNE FAULK JOHNSON, Defendant.

Appeal by Defendant from judgment entered 12 May 2017 by Judge Rebecca W. Holt in Durham County Superior Court. Heard in the Court of Appeals 16 October 2019.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Sandra Wallace-Smith, for the State.*

*Rudolf Widenhouse, by M. Gordon Widenhouse, Jr., for Defendant.*

DILLON, Judge.

Defendant Dmarlo Johnson appeals from a final judgment entered in superior court finding him guilty of first-degree (felony) murder and robbery with a dangerous weapon. After careful review, we conclude that Defendant received a fair trial, free from reversible error.[1]

---

[1] Defendant was represented by appellate counsel when the records and briefs were filed. After the record and all briefs, including Defendant's reply brief, had been filed, on 19 August 2019, Defendant filed a pro se Motion for the Replacement of Appellate Counsel. On 28 August 2019, this Court dismissed the motion without prejudice based upon N.C. Gen. Stat. § 7A-498.8(b)(1). This case

## I. Background

On 4 July 2015, Defendant robbed a convenience store, fatally shot the store clerk, and then assaulted a law enforcement officer with his gun as he was exiting the store. There is no dispute that Defendant was the perpetrator or that Defendant was legally sane that day. Rather, Defendant claims he acted with diminished capacity.

Prior to the 2015 robbery/shooting, Defendant was identified as a man of below-average intelligence, who suffered from bipolar disorder and depression.

On 3 July 2015, the day before the robbery/shooting, Defendant drove recklessly by "doing donuts" near a crowd of people and then eluding police. He was cited later that day for the incident.

On 4 July 2015, in the early morning hours, Defendant entered a convenience store with his face covered. Much of what transpired while he was there was recorded by security cameras. Defendant threatened the customers inside, ordering them to leave. The store clerk, Amer Mahmood, remained in the store. Defendant stole money from the cash register, items from the store, and Mr. Mahmood's wallet. At

---

was heard without oral argument, so Defendant's appellate counsel had already completed everything needed for this case to be decided prior to the filing of Defendant's pro se motion. Defendant's counsel then filed a Motion to Withdraw as Appellate counsel and Defendant filed a Motion for Appointment of Counsel. We originally filed an opinion in this matter on 16 June 2020 and denied Defendant's Motion for Appointment of Counsel. Upon motion of the appellate counsel on behalf of Defendant to withdraw the opinion, we have withdrawn the original opinion and filed this new opinion solely to address Defendant's Motion for Appointment of Counsel. This footnote is the only substantive change to the opinion. We grant Defendant's Motion for Appointment of Counsel for any further proceedings in our appellate court system.

some point Mr. Mahmood recognized Defendant, calling him "Marlo." Shortly after being recognized by Mr. Mahmood, Defendant shot Mr. Mahmood six times, mortally wounding him.

Defendant exited the store and placed stolen items in his car. He then returned to shoot out surveillance cameras. As Defendant was returning to his car, he encountered police officers. He refused orders to drop his gun, pointing the gun at one of the officers. A series of gunshots from Defendant and the officers ensued. Defendant was subdued after being struck. Defendant was taken to the hospital, where he was treated for his wounds.

Days later, Defendant was formally arrested and held in custody while awaiting trial.

On 13 August 2015, about six weeks after the robbery/shooting, Defendant was first examined by a Dr. Corvin, his expert who would testify at trial concerning his diminished capacity. Over the course of the next several months, Dr. Corvin developed his diagnosis that Defendant suffered from bipolar disorder, which caused Defendant to act with diminished capacity when Defendant killed Mr. Mahmood.

On 23 April 2017, the day before the trial was to begin, the State informed Defendant of its intent to introduce certain evidence to rebut Dr. Corvin's testimony. This rebuttal evidence consisted of recordings of certain jailhouse calls made by Defendant around the time he first met with Dr. Corvin in August 2015, which the

State contended demonstrated that Defendant showed no signs of diminished capacity.

The next day, on the first day of trial, Defendant's counsel sought a continuance to allow time to review the rebuttal evidence or, in the alternative, a ruling not to allow the State to introduce the recordings as rebuttal evidence. The trial court denied Defendant's requests.

The trial lasted several weeks. On 9 May 2017, after Dr. Corvin testified concerning Defendant's bipolar disorder, the State introduced the recordings in rebuttal to Dr. Corvin's testimony over Defendant's objection.

On 12 May 2017, the jury returned guilty verdicts for felony murder and for armed robbery. The trial court sentenced Defendant to life without parole on the murder conviction and a term of years on the robbery conviction, to run consecutively with his life sentence.

Defendant timely appealed.

## II. Argument

On appeal, Defendant argues that the trial court erred in denying his request for a continuance made at the start of trial. Further, Defendant argues that the trial court's error was a *constitutional* error in that Defendant's trial counsel was denied the opportunity to prepare an adequate defense to respond to the State's rebuttal evidence:

> Finally, the gravity of harm [Defendant] would suffer without the continuance was substantial. He faced a sentence of life without parole. His capacity at the time of the crimes was central to the case. The telephone calls were introduced to undermine [Defendant's] mental health defense. Denying counsel time to prepare to deal with these telephone calls was untenable.

We address Defendant's argument as it pertains to each of his convictions in turn.

A. Felony Murder Conviction

As explained below, based on controlling jurisprudence, we must conclude that Defendant is not entitled to a new trial on his felony murder conviction. Specifically, because the underlying felony supporting the jury's felony murder conviction was a "general intent" crime, Dr. Corvin's testimony concerning Defendant's diminished capacity was not relevant to this conviction.

The jury was presented with three theories by which they could convict Defendant of first-degree murder for fatally shooting Mr. Mahmood. The jury rejected the State's theory that Defendant killed Mr. Mahmood based on *premeditation and deliberation*. However, the jury found Defendant guilty based on the two other theories, each of which is based on the felony murder rule. First, the jury determined that Mr. Mahmood's death was sufficiently associated with Defendant's commission of armed robbery. Second, the jury determined that Mr. Mahmood's death was sufficiently associated with Defendant's assault on a law enforcement officer with a deadly weapon as he was exiting the convenience store.

The trial court sentenced Defendant to a term of life imprisonment for felony degree murder based on the jury's finding that the killing was sufficiently associated with Defendant's assault on a law enforcement officer with a deadly weapon. The jury separately convicted Defendant of this underlying felony; however, since that felony was used to elevate the killing to felony murder, the trial court arrested judgment on that underlying conviction.

Our Supreme Court has held that the felony of assault with a firearm upon a law enforcement officer is a *general intent* crime for which the diminished capacity defense[2] is not available:

> [A]ssault with a firearm upon a law enforcement officer in the performance of his duties . . . may be described as a general-intent offense.
>
> \* \* \*
>
> Accordingly, we now hold that the diminished-capacity defense is not available to negate the general intent required for a conviction of assault with a deadly weapon on a government officer.

---

[2] We note that the jury was not instructed on the defense of insanity, which would be a complete defense to all the charges for which Defendant was convicted, even a conviction for general intent crimes. Indeed, Defendant made no argument before the jury nor makes any argument on appeal that he was legally insane when he killed Mr. Mahmood and stole from him and the store. Defendant merely asserts that he acted with diminished capacity when he committed those acts, and it was this defense on which the jury was instructed.

*State v. Page*, 346 N.C. 689, 700, 488 S.E.2d 225, 232 (1997).  And our Supreme Court

further held that diminished capacity is not a defense to a felony murder conviction

based on that underlying general intent felony:

> We allow defendants to assert diminished mental capacity
> as a defense to a charge of premeditated and deliberate
> murder because we recognize that some mental conditions
> may impede a defendant's ability to form a specific intent
> to kill.  This reasoning is not applicable to the knowledge
> element of the felony of assault with a deadly weapon on a
> government officer.

*Id.* at 699, 488 S.E.2d at 232 (citation omitted).

Here, Defendant makes no argument on appeal concerning his conviction for

the felony of assault with a deadly weapon on a law enforcement officer or the use of

*that* felony to support his felony murder conviction.  Therefore, based on Supreme

Court precedent, we must conclude that any error by the trial court in not allowing

Defendant time to prepare for the State's rebuttal of his defense is non-prejudicial,

no matter our standard of review.

## B. Armed Robbery Conviction

The jury convicted Defendant of armed robbery.  The trial court sentenced

Defendant to a term of imprisonment to run consecutively to his life sentence for the

felony murder conviction.

Armed robbery is a specific intent crime.  *See State v. Lunsford*, 229 N.C. 229,

231, 49 S.E.2d 410, 412 (1948) (explaining that the State must prove that the

defendant had the specific intent to steal). Therefore, diminished capacity is a defense to this felony. Accordingly, Defendant's arguments on appeal regarding the State's rebuttal evidence to Dr. Corvin's testimony are relevant to his armed robbery conviction, and we address them below.

On appeal, Defendant argues that he was prejudiced when the State was allowed to introduce recordings of nine (9) jailhouse phone calls he made around the time he met with Dr. Corvin. Defendant also argues that he was prejudiced when the trial court denied his motion for a continuance to allow his counsel time to prepare to respond to those nine (9) calls. For the reasoning stated below, we conclude that the trial court did not err in denying Defendant's motion to continue or in overruling Defendant's objection to the State's rebuttal evidence.

The circumstances regarding the introduction of the State's rebuttal evidence are as follows:

Dr. Corvin first met with Defendant on 13 August 2015, weeks following the killing, while Defendant was in custody. During that time, Defendant had made a number of jailhouse phone calls, some to his girlfriend, who would be a witness for him at trial. Defendant and his counsel were aware that these calls were being recorded. In any event, many months prior to trial, Defendant's counsel noticed their intent to assert various diminished capacity defenses.

Shortly before trial, the State came into possession of the 835 recorded phone calls Defendant had been a party to while in custody. These calls were made available to Defendant's counsel. The State considered using some of the jailhouse calls made by Defendant to his girlfriend, but then decided against it. Defendant's defense team decided not to review any of the calls or ask for a continuance for more time to review the calls to see if there was evidence helpful to Defendant's diminished capacity defense.

However, just before the day of trial, after previously telling Defendant's counsel that they did not intend to use any of the recordings, the State prosecutors determined that they did intend to use some of the calls as rebuttal to any testimony Dr. Corvin might give; specifically, certain calls made the day before, the day of, and the day after Dr. Corvin's first examination of Defendant. The prosecution indicated that the calls were relevant to show Defendant's mental capacity during the time Defendant was examined by Dr. Corvin. Upon learning of the State's intent to use these calls (fewer than thirty) as rebuttal evidence, Defendant's counsel sought a continuance on the first day of trial to be allowed to listen to all 835 calls made by Defendant over the period of several months. The trial court denied the motion.

The trial began and centered largely on Defendant's state of mind around the time he killed Mr. Mahmood. The State put on evidence of Defendant's theft and killing at the convenience store, including video evidence from the surveillance

cameras that caught much of Defendant's actions. This evidence tended to show that Defendant ordered customers out of the store, he ordered the store clerk Mr. Mahmood to remain behind the counter, he shot Mr. Mahmood when Mr. Mahmood called Defendant by name, and he shot out a surveillance video camera.

Defendant put on evidence which tended to show Defendant had below average intelligence, that he had suffered and had been treated for mental disorders, that he was acting rashly in the days and hours leading up to the killing, and that he was under the influence of alcohol and drugs at the time of the killing.

Defendant called Dr. Corvin, who testified concerning his evaluation of Defendant, including his initial meeting with Defendant on 13 August 2015. Dr. Corvin testified that Defendant was very moody during their first encounter. He testified that this initial meeting alone did not reveal to him a man who suffered from bipolar disorder, but rather a man with

> an antisocial personality disorder, the kind of guy who takes advantage of people, et cetera[.] Not that much we can really do about that. And trust me, as a forensic psychiatrist, I spend a lot of my time in prison. We see plenty of those folks, and it is what it is, and knowing nothing more other than what I saw of him in August of 2015, that's kind of what I [and the other doctors treating Defendant] thought[.]

He testified that over time after his initial meeting and after reviewing Defendant's medical records, he opined that Defendant suffered from bipolar disorder. He testified that Defendant's disorder combined with Defendant's ingestion of alcohol

and drugs on the day of the shooting caused Defendant to act with diminished capacity.

The State, in rebuttal, presented a court-appointed expert, who testified that Defendant had below average intelligence; that Defendant was not bipolar but rather suffered from alcohol and cocaine substance abuse disorder; that though Defendant was intoxicated during the shooting, he was not impaired (based on her viewing of the surveillance video); and that Defendant had the ability to form the specific intent to kill during the shooting.

The State, in rebuttal, also introduced nine (9) jailhouse calls – the calls which are the subject matter of Defendant's arguments on appeal – that Defendant made around the time he first met with his expert Dr. Corvin. The State introduced these calls to show Defendant's mental ability around the time he met with Dr. Corvin. Quoting Defendant's brief, "[t]he calls indicated he was planning things, such as trying to make bond. He discussed a bond with his mother. He spoke to a bondsman. He added up money correctly."

The case was given to the jury, which found Defendant guilty of felony murder, felony assault on an officer with a deadly weapon, and armed robbery.

Ordinarily, "a motion for a continuance is . . . addressed to the sound discretion of the trial judge" and will not be disturbed on appeal "absent gross abuse." *State v. Searles*, 304 N.C. 149, 153, 282 S.E.2d 430, 433 (1981) (citations omitted). However,

"when such a motion raises a constitutional issue, the trial court's action upon it involves a question of law which is fully reviewable by an examination of the particular circumstances of each case." *Id.* at 153, 282 S.E.2d at 433 (citation omitted). And "the constitutional guarantees . . . include the right of a defendant to have a reasonable time to investigate and prepare his case." *Id.* at 153-54, 282 S.E.2d at 433 (citations omitted). *See State v. Rogers*, 352 N.C. 119, 124, 529 S.E.2d 671, 675 (2000) (stating that defense counsel "shall have a reasonable time to investigate, prepare, and present his defense"); *see also State v. Tunstall*, 334 N.C. 320, 328, 432 S.E.2d 331, 336 (1993).

Here, we conclude that the trial court's denial of a continuance did not deprive Defendant of his constitutional right to present his defense for a number of reasons.

First, Defendant's counsel knew for quite a while that recordings of these calls existed. Counsel had plenty of time to request the recordings if they thought there was any evidence contained therein tending to bolster their defense that Defendant suffered from bipolar disorder. Such evidence (if it exists) did not suddenly become relevant to Defendant's case when the State informed Defendant's counsel that they planned to use some of the calls as rebuttal to Dr. Corvin's testimony. Such evidence was relevant all along in Defendant's case. If Defendant's counsel thought there might be evidence on those calls, recordings which involved Defendant and Defendant's family and which Defendant's counsel knew existed for many months,

they should have been more diligent in seeking a continuance, not waiting until the eve of trial. *See Tunstall,* 334 N.C. at 328, 432 S.E.2d at 336.

Second, Defendant has failed to show any prejudice. *See Searles*, 304 N.C. at 153, 282 S.E.2d at 433 ("Denial of a motion for a continuance, [even a motion raising a constitutional issue], is, nevertheless, grounds for a new trial only upon a showing by defendant that [he] was prejudiced thereby.").

Here, Dr. Corvin testified that he did not pick up on Defendant's bipolar disorder during his meeting in August 2015, but initially thought Defendant was antisocial and also a person who takes advantage of others. He only later concluded that Defendant was bipolar, indicating that Defendant suffered from mood swings that, at times, caused him to act impulsively or without specific intent. But the State's introduction of the phone calls made around the day Dr. Corvin met with Defendant did not contradict what Dr. Corvin testified he saw of Defendant during their initial meeting, a person who could plan. And these calls do not contradict Dr. Corvin's testimony that Defendant suffers from bipolar disorder and could act with diminished capacity at times, especially during extreme manic periods heightened by being under the influence of impairing substances. That is, Dr. Corvin did not testify that Defendant's bipolar disorder caused Defendant to act with legal diminished capacity at the time he first met him in August. He testified that due to his bipolar disorder and being under the influence of impairing substances, Defendant acted with

diminished capacity, unable to form a specific intent, when he shot and stole from Mr. Mahmood.

Also, the State's focus during its closing focused more on the evidence concerning Defendant's state of mind when he was in the convenience store, *as exhibited on the surveillance tapes*, rather than on what Defendant's mental capacity was on the day of his meeting with Dr. Corvin. That is, the jury made its finding that Defendant did not act with diminished capacity based on what they saw on the surveillance tapes of the crime rather than how Defendant sounded on some phone calls six weeks later.

And finally, Defendant has not made any showing that any of the 835 calls would have actually been helpful in addressing the State's rebuttal evidence. Indeed, in *Searles*, our Supreme Court held that the trial court did not constitutionally err in denying a motion to continue to allow the defendant's counsel to review newly-discovered evidence where the defendant failed to show on appeal what this evidence would show and how it would, in fact, be material. *See Searles* 304 N.C. at 154, 282 S.E.2d at 434. *See also State v. Phillip*, 261 N.C. 263, 267, 134 S.E.2d 386, 390 (1964) (stating that "a postponement is [only] proper where there is a belief that material evidence will come to light and such belief is reasonably grounded on known facts").

III. Conclusion

We conclude that Defendant received a fair trial, free from reversible error. Defendant fails to make any argument showing reversible error in his conviction for felony murder where the underlying felony is a general intent crime.

As to Defendant's conviction for armed robbery, a specific intent crime, we conclude that the trial court did not commit reversible error in denying Defendant's motion for a continuance or otherwise allowing the State to offer its rebuttal evidence. There was strong contradictory evidence offered by both the State and Defendant's counsel as to whether Defendant acted with diminished capacity. The jury heard the evidence and made their decision.

NO ERROR.

Judge BERGER concurs.

Judge STROUD dissents, writing separately.

STROUD, Judge, dissenting.

I respectfully dissent because the majority fails to apply the correct standard of review, and, under that standard, Defendant is entitled to a new trial. Defendant asserted both at trial and on appeal constitutional arguments to support his motion to continue. "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2017). The majority shifts this burden to Defendant and finds the phone calls used by the State were merely "rebuttal evidence." But the importance of evidence is not determined by whether it is in the case in chief or rebuttal; indeed, rebuttal evidence can be the most significant, particularly when a defendant has no opportunity to respond to it. As Defendant's brief accurately noted, by using the phone calls as rebuttal, "the state made sure the disputed telephone calls were the very last items of evidence the jury heard and considered before it began its deliberations." And because Defendant presented evidence at trial, the State also had the benefit of the final argument to the jury, leaving Defendant with no opportunity to respond to the State's arguments regarding the jail calls. *See* Gen. Rules of Practice for the Super. & Dist. Ct., R. 10, 276 N.C. 735, 738 (1970) ("In all cases, civil and criminal, if no evidence is introduced by the defendant, the right to open and close the argument to the jury shall belong to him.").

The issue at trial, and in this appeal, is not whether Defendant was the person who robbed the convenience store and fatally shot the clerk. The only real issues at trial were Defendant's capacity and state of mind at the time of the shooting, 4 July 2015. Those issues are relevant to the jury's determination of his intent and the exact crimes for which he could be convicted. Even assuming the jury would have convicted Defendant of some crime, the difference between a sentence for first degree murder and second degree is not insignificant.[3] The jury found Defendant not guilty of first degree murder based on malice, premeditation, and deliberation, but guilty of first degree murder based on the felony murder rule based upon robbery with a firearm and assault with a firearm on a law enforcement officer.

I. Factual Background on State's Intent to Use Jail Calls as Evidence and Defendant's Objections

The majority glosses over the actual timing of the production of the phone calls and the State's repeated assurances it did not intend to use *any* of the phone calls. The majority also relies upon the State's evidence of Defendant's commission of the crimes, especially the video surveillance tapes, which it states show "Defendant's state of mind when he was in the convenience store[.]" The majority does not explain how a *video* can show a "state of mind" as relevant to this case. A video of a person shooting in a convenience store would not necessarily look any different whether the

---

[3] Based upon Defendant's intellectual disability, mental illness, and impairment by alcohol and drugs, his trial counsel argued at trial that Defendant should be convicted only of second degree murder.

2

shooting was committed by a person suffering from a severe mental illness or incapacity as opposed to a person of average intelligence and unimpaired mental capacity. But even if the video may show indications of "state of mind" as relevant to Defendant's alleged incapacity, the video surveillance from the convenience store *was* interpreted differently by the two expert witnesses testifying about their evaluations of Defendant. The video surveillance alone does not weaken or eliminate Defendant's arguments. The differing interpretations of the video by Defendant's expert and the State's expert actually strengthens Defendant's arguments on appeal, since the State used the phone calls solely to attack the evaluation by Defendant's expert.

Around 6:00 PM on the Sunday evening before trial was to begin, the State notified Defendant's counsel it would be using twenty-three phone calls as evidence. Before the trial began, Defendant moved to exclude the phone calls or continue the trial so his counsel would have an opportunity to prepare for trial by listening to the phone calls. Defendant's "first request" was that the trial court "exclude those phone calls and allow us to proceed[;]" in the alternative, he requested "to continue the matter so that I can prepare this case like it should be prepared. It's a first-degree murder case, and we're dealing with a lot of complicated mental health issues here." Defendant's counsel argued, "My client's right to due process will be violated by the admission of these phone calls. He has a right to an effective assistance to counsel is [sic] going to be affected. His right to confront witnesses is going to be affected."

Defendant's counsel invoked his right under both the United States and North Carolina Constitutions. *See* U.S. Const. amends. V, VI, XIV; N.C. Const. art. I, §§ 19, 23. He raised his constitutional objections and motion to continue both before trial and again after jury selection. He also renewed the objections when the phone call evidence was presented.

A full understanding of the relevance of the phone calls used by the State and the potential prejudice to Defendant requires some background information regarding Defendant's psychiatric evaluation. Defendant was evaluated by Dr. George Corvin, a general forensic psychiatrist, on 13 August 2015, about a month and a half after the shooting. At this time, Defendant was not yet on medication for his mental illness, although he had previously been diagnosed and treated prior to the shooting.[4] Dr. Corvin diagnosed Defendant with Bipolar I disorder; cannabis, alcohol, and cocaine use disorders; mild intellectual developmental disorder; and neurodevelopmental disorder (fetal alcohol syndrome) related to his mother's known use of alcohol during her pregnancy with Defendant. On 19 July 2016, Defendant filed his notice of defense under North Carolina General Statutes §§ 15A-905, 959:

> 1) Mental infirmity and diminished capacity under GS 15A-959 (b); and
> 2) Mental infirmity and insanity under GS 15A-959 (a); and
> 3) Voluntary intoxication

---

[4] By the time the State's expert witness evaluated Defendant, he had been on medication for months. At trial, Dr. Laney, a psychologist, testified that she did not believe Defendant was actually suffering from bipolar disorder, despite his prior diagnosis by other psychiatrists and continued treatment for the disorder.

4

> These defenses are based upon the defendant's state of mind at the time of the offense including a mood disorder, his use of alcohol and drugs, and his impaired neurocognitive functioning and intellectual disabilities.

Around the same time, Defendant also provided the State with Dr. Corvin's report.

Almost a year after the State received Dr. Corvin's report, trial was set to begin on 24 April 2017. On Thursday, 13 April 2017, the State disclosed to Defendant's counsel written summaries of interviews with some potential new witnesses it intended to call to testify and a disc which the prosecutor "represented . . . were jail phone calls allegedly from [Defendant] to various people." Neither Defendant's counsel nor his investigator were able to open the disc due to the file format. 14 April 2017 was Good Friday, a state holiday.

On Monday, 17 April, Defendant's counsel contacted the prosecutor and got a disk with a different file format. His investigator opened the disk and discovered it contained approximately 335 recorded telephone calls Defendant made from jail. At 9:28 AM on Tuesday, 18 April, Defendant's counsel emailed the prosecutor regarding the phone calls:

> Yesterday afternoon we received a copy of the jail call disc in a format that we could open and I will not have time to listen to them and do not think I have anyone in my office that can assist. Please let me know if there are any calls which you believe are somehow relevant to your case.

5

At 12:50 PM the same day, the prosecutor responded to the email, assuring Defendant's counsel "I haven't listen [sic] to most of [the phone calls]" and *"[a]t this time I do not intend to use any of those calls, and I am no longer requesting anyone to continue listening to the calls."* (Emphasis added.)

On Thursday, 20 April 2017, the State provided to Defendant's counsel another disc with "550 +" *additional* phone calls. At 11:13 AM, Defendant's counsel emailed the prosecutor again:

> My office just picked up the disc with 550 + phone calls. I am assuming that your earlier email applies and these were just more calls from your earlier request. Let me know if my assumption is incorrect.

At 6:25 PM the same day, the prosecutor responded, confirming his prior email stating that the State did not intend to use any of the phone calls:

> *I do not intend to introduce any of the jail calls.* These calls were requested at a different time from the other calls; however, the delay in receiving the calls was even greater than the delay related to the prior calls that were delivered to you.

Based upon this assurance, Defendant's counsel and his investigator stopped listening to the phone calls to focus on other information provided by the State that same week. Along with the phone calls, the prosecutor also provided to Defendant's counsel information regarding a new witness, Mr. Saeed, the decedent's former roommate. Defendant's counsel determined he would need to talk to Mr. Saeed and "spent a good part of [the week prior to trial] . . . maybe even a day and a half, two

days, looking for Mr. Saeed." Then later in the week, the State provided yet another more detailed statement from Mr. Saeed and a statement from another new witness, Mr. Chaudry. Police officers had talked to Mr. Chaudry, the owner of the convenience store, the night of the shooting. Defendant's counsel noted that although the police "had plenty of contact with Mr. Chaudry 20 some months ago, and now we're getting statements from Mr. Chaudry."[5] In his argument to the trial court, Defendant's counsel noted that

> all these statements came about approximately 21 to 22 months after this offense occurred, statements by a witness that people knew but nobody ever bothered to talk to. . . . and that's kind of going on the same time as these phone calls being given to me.

Thursday, 20 April 2017, was the last day Defendant's investigator, Mr. McGough, was available to assist with trial preparation "because he was pretty sick and didn't come to work the next day." He was out with pneumonia until "sometime after trial began."

On Sunday, 23 April 2017, the prosecutors[6] were working on the case and as Assistant District Attorney Dornfried explained to the trial court, he suddenly had an idea of a way to attack Dr. Corvin's evaluation of Defendant:

---

[5] The State identified 45 potential witnesses at the start of the trial, and 21 witnesses testified for the State.

[6] The State had two attorneys working on the case and both were present for the entire trial. Defendant had only one court-appointed attorney.

7

> it just had dawned on me we do have recordings or we might. I didn't know if we did or not, but we might have recordings of the defendant, which is the jail calls that had been pulled not for the purposes of determining what is condition was like around the time Dr. Corvin was interviewing him and evaluating him[.[7]]

At 5:50 PM, the prosecutor emailed Defendant's counsel to inform him that contrary to his prior email, he now intended to use some of the phone calls. The email also explained the potential relevance and importance of the particular phone calls the State intended to use.

> After we confirmed yesterday that Dr. Corvin did not make any recordings of the Defendant on the day that he saw him exhibiting unusual behaviors, we didn't think more of the issue. *Today, it occurred to us that there are recordings of the Defendant on that day, although not with Dr. Corvin. The recordings are of the jail calls. We have listened to some jail calls and decided that they are relevant material to his state of mind as well as his memory of the night of the murder.*
>
> The jail calls that are from August 12 - August 14, 2015 are calls numbered 251 - 274. We do not intend to use the calls that only constitute phone sex or involve the Defendant's child. You can tell the call numbers by clicking on the icon and going to properties and index. You can print the call log at the very bottom of the folder to line the call numbers up with the phone numbers date and time.

(Emphasis added.) The twenty-three phone calls the prosecutor initially identified as calls which may be used as evidence lasted approximately three and a half hours.

---

[7] The State had gotten the recordings to see if Defendant had discussed the events with his girlfriend but were unable to find any such conversations.

In the hearing before trial, after arguments from Defendant and the State, the trial court denied Defendant's motion to continue and ordered the State could introduce only the twenty-three phone calls identified in the Sunday night email but only during rebuttal and not as part of its case-in-chief, in accord with how the State had announced it intended to use the calls. The trial court did not limit the Defendant in using the phone calls, but since Defendant's sole attorney was representing him in trial, his counsel had no meaningful opportunity to listen to even twenty-three phone calls—and certainly not over 800 calls—or to prepare to use them. Based upon the estimates of the average length of each call, it would take between 95 and 140 hours to listen to all the phone calls.

Jury selection ended on Friday 28 April at 11:28 AM. Defendant's counsel requested to adjourn until Monday so he could have an opportunity to listen to the phone calls over the weekend before opening statements. He wanted a chance to consult with his "mental health professionals" about the calls as well. The State opposed Defendant's request because it had a witness from out of state and hoped to complete the witness's testimony so he could take a flight home that afternoon. The trial court denied Defendant's motion, immediately empaneled the jury, and proceeded to opening statements.

Defendant again renewed his objections to the State's use of the jail phone calls before the State's presentation of the evidence on rebuttal. Defendant's counsel noted

that he had still not had time to prepare for the State's use of the calls on rebuttal or to prepare any surrebuttal. He had listened to some of the calls but had no opportunity to go over the calls with his expert witnesses or to determine how to use any calls.

Although the majority does not appreciate the significance of Defendant's need to listen to the calls and to prepare for the rebuttal evidence identified by the State the evening before trial, the State's brief does, and the State attempts to explain why Defendant was not prejudiced by his counsel's inability to prepare. The State argues others assisting Defendant's counsel could have listened to the calls *during* the trial. The State's brief repeatedly refers to the "defense team" but cites to only one portion of the transcript in support of this assertion. For example, the State argues, "Where the record shows that the defense team consisted of two investigators and three attorneys, there was ample time for his team to review the telephone calls in question and confer with their mental health expert about them." But the record does not show a "defense team" with several attorneys available to provide assistance during trial. Defendant accurately points out that "the record belies this argument. Defense counsel did not have co-counsel. The other attorneys who were periodically in court with him were either new to the office or just observing. The lead investigator had

been sidelined by pneumonia and the other investigator was merely providing rote

assistance."[8]

The State also argues that "Defendant was personally aware of the content of

the calls he made." The State seeks to compare Defendant's awareness of his phone

calls to the defendant's knowledge of two brief oral statements in *State v. Tunstall*:

> The record does show that the defendant's counsel received tardy notice—less than a week before the defendant's trial began—of two oral statements made by the defendant. These statements consisted of (1) the defendant's statement to Deputy J.A. McCowan, "I shot the mother f— —er, he's over there dead" and (2) the defendant's statement to Auxiliary Deputy Ronnie Baskett, "I hope I killed the mother f——er." The defendant's counsel had at least three days between notification of these statements and the beginning of jury selection in the defendant's trial in which to investigate the circumstances under which the statements were made. The defendant has not shown that additional time would have enabled his counsel to better confront the witnesses who testified that the defendant made these statements.

334 N.C. 320, 332, 432 S.E.2d 331, 338 (1993). There was no need for an expert

witness to address the relevance of those two brief statements. In addition, the two

---

[8] During Defendant's argument renewing his objections prior to the State's presentation of rebuttal evidence, the trial court inquired about other members of the "defense team" in the courtroom during portions of the trial. Defendant's counsel explained that one attorney sat in "helping me with voir dire" but did not "know anything about the case." Another attorney was a "brand-new lawyer in our office" who was only there to observe. Mr. McGough was the primary investigator for Defendant's counsel, and his absence due to pneumonia had already been noted at the beginning of the trial. The other investigator was Ms. Winston, who "had very limited involvement in this case. Really last week was probably -- she got involved helping me when Mr. McGough came down with pneumonia." The State did not refute any of Defendant's arguments regarding the nonexistence of a "defense team" at trial. The transcript and record confirm that only one attorney appeared as trial counsel for Defendant, from appointment of counsel until his notice of appeal.

statements in *Tunstall* were presented during the State's evidence—not during rebuttal—so the defendant's counsel had the opportunity to address the late disclosure of the statements and "reveal the weaknesses" in the testimony of the officers, as noted by the Supreme Court:

> On cross-examination, both McCowan and Baskett admitted that they had not told the prosecutor about the defendant's statements until the week before his trial. Both witnesses also admitted that they had not reduced the defendant's statements, made nearly eleven months earlier, to writing. Far from being unprepared to confront these witnesses, the defendant's attorney skillfully revealed to the jury the weaknesses in their testimony.

*Id.*

*Tunstall* is inapposite to this case. The State's argument assumes Defendant, despite his uncontested intellectual disability and illiteracy, could recall over 800 phone calls *and* could also appreciate and explain to his counsel the potential relevance of the particular calls identified by the State in the context of Dr. Corvin's psychiatric evaluation of his mental capacity.[9] Defendant's counsel had no co-counsel to assist during the trial by listening to the calls or developing any additional evidence based upon the calls and his primary investigator was sick during the times he might have been able to provide meaningful assistance. But again, the trial court denied all of Defendant's objections to the State's use of the phone calls on rebuttal.

---

[9] The State's expert witness agreed with Defendant's expert witnesses as to his intellectual disability. Defendant never learned to read or write and functioned at second-grade level.

12

In summary, the State had notice of Dr. Corvin's report, and the dates of his evaluations of Defendant, for over a year before trial. The State assured Defendant's counsel—who was trying to prepare for a murder trial where the State had identified 45 potential witnesses—it would not use any of the jail phone calls during the trial. The prosecutor specifically stated, "I am no longer requesting anyone to continue listening to the calls" on the Tuesday before trial and confirmed this again on Thursday evening. But on the very eve of trial, the State changed its position and stated it would use some of the phone calls as evidence.

I also note I am baffled by one the majority's arguments which states, "If Defendant's counsel thought there might be evidence on those calls, recordings which involved Defendant and Defendant's family and which Defendant's counsel knew existed for many months, they should have been more diligent in seeking a continuance, not waiting until the eve of trial." The State does not dispute the timeline described above. Certainly, Defendant was aware he made phone calls while he was in jail, but even the State had been unable to get access to these recordings until shortly before trial. Actually, the *State* waited until Sunday evening—the day before trial—to advise Defendant it planned to use some of the approximately 800 phone calls, after specifically advising his counsel, twice, it would *not* use any of the calls. Defendant could not have requested a continuance based upon the State's

intended use of the phone calls a moment sooner than he did, as he made his motion immediately upon the inception of the case on Monday morning.

## II.    Standard of Review

The majority states "any error by the trial court by not allowing Defendant time to prepare to address the State's rebuttal of his diminished-capacity defense is non-prejudicial, no matter our standard of review."  Our Supreme Court has established the correct standard of review for this issue:

> It is well established that a motion to continue is ordinarily addressed to the trial judge's sound discretion and his ruling thereon will not be disturbed except upon a showing that he abused that discretion. However, *when a motion to continue is based on a constitutional right, the question presented is a reviewable question of law.* The denial of defendant's motion in this case presents constitutional questions.

*State v. McFadden*, 292 N.C. 609, 611, 234 S.E.2d 742, 744 (1977) (emphasis added) (citations omitted).

In this situation, the trial court's ruling on the motion to continue is reviewed as a "question of law that is fully reviewable on appeal by examination of the particular circumstances presented in the record."  *State v. Blakeney*, 352 N.C. 287, 301-02, 531 S.E.2d 799, 811 (2000).  The majority fails to review the ruling as a question of law or to examine the "particular circumstances presented in the record." *Id.*  Our Courts have also noted the "particular importance" of the "reasons for the requested continuance presented to the trial judge at the time the request is denied."

14

*State v. Barlowe*, 157 N.C. App. 249, 254, 578 S.E.2d 660, 663 (2003) (quoting *State v. Roper*, 328 N.C. 337, 349, 402 S.E.2d 600, 607).

## III.    Analysis

Because Defendant preserved his constitutional arguments regarding his right to effective assistance of counsel, due process, and confrontation of witnesses, I will analyze the trial court's denial of his motion to continue *de novo*. First, the reason for the request was the *State's* last-minute decision to use evidence it had until the eve of trial assured Defendant's counsel it would not use. *See id*.

Where Defendant's motion to continue raised constitutional issues of confrontation and effective assistance of counsel, "the trial court's ruling is 'fully reviewable by an examination of the particular circumstances of each case.'" *State v. Rogers*, 352 N.C. 119, 124, 529 S.E.2d 671, 675 (2000) (quoting *State v. Searles*, 304 N.C. 149, 153, 282 S.E.2d 430, 433 (1981)). The Supreme Court in *State v. Rogers* explained the proper analysis for this motion to continue:

> In most circumstances, a motion to continue is addressed to the sound discretion of the trial court, and absent a manifest abuse of that discretion, the trial court's ruling is not reviewable. However, when a motion to continue raises a constitutional issue, as in the instant case, the trial court's ruling is "fully reviewable by an examination of the particular circumstances of each case." Generally, the denial of a motion to continue, whether a constitutional issue is raised or not, is sufficient grounds for the granting of a new trial only when the defendant is able to show that the denial was erroneous and that he suffered prejudice as a result of the error.

The rights to effective assistance of counsel, to confrontation of accusers and witnesses, and to due process of law are guaranteed in the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and Sections 19 and 23 of Article I of the Constitution of North Carolina. "It is implicit in the constitutional guarantees of assistance of counsel and confrontation of one's accusers and witnesses against him that an accused and his counsel shall have a reasonable time to investigate, prepare and present his defense." A defendant must "be allowed a reasonable time and opportunity to investigate and produce competent evidence, if he can, in defense of the crime with which he stands charged and to confront his accusers with other testimony." This Court has previously recognized and discussed the United States Supreme Court's analysis of these claims:

> In addressing the propriety of a trial court's refusal to allow a defendant's attorney additional time for preparation, the Supreme Court of the United States has noted that the right to effective assistance of counsel "is recognized . . . because of the effect it has on the ability of the accused to receive a fair trial." While a defendant ordinarily bears the burden of showing ineffective assistance of counsel, prejudice is presumed "without inquiry into the actual conduct of the trial" when "the likelihood that any lawyer, even a fully competent one, could provide effective assistance" is remote. A trial court's refusal to postpone a criminal trial rises to the level of a Sixth Amendment violation "only when surrounding circumstances justify" this presumption of ineffectiveness.
>
> "To establish a constitutional violation, a defendant must show that he did not have ample time to confer with counsel and to investigate, prepare and present his defense."

*Id.* at 124-25, 529 S.E.2d at 674-75 (alteration in original) (citations omitted).

The majority opinion assumes no prejudice to Defendant from the trial court's denial of continuance or disallowing use of the jail calls by the State, again failing to apply the proper standard. It is correct that even when the defendant raises a constitutional basis for the motion to continue, a new trial may be granted only if "denial was erroneous and that [defendant] suffered prejudice as a result of the error." *Id.* at 124, 529 S.E.2d at 675. But the *Rogers* court then explains that prejudice is *presumed* if

> "the likelihood that any lawyer, even a fully competent one, could provide effective assistance" is remote. A trial court's refusal to postpone a criminal trial rises to the level of a Sixth Amendment violation "only when surrounding circumstances justify" this presumption of ineffectiveness.

*Id.* (citation omitted) (quoting *Tunstall*, 334 N.C. at 329, 432 S.E.2d at 336).

Here, no lawyer of any level of competence could listen to the approximately three and a half hours of phone calls, and certainly not all 90 to 140 hours of calls, during a fifteen day murder trial, and then do any needed investigation based on the calls, and discuss the relevance of particular calls with expert witnesses to prepare for the rebuttal evidence. There are not enough hours in a day, and even competent counsel must sleep occasionally. Prejudice must be presumed because there was no likelihood Defendant's counsel could provide effective assistance. But Defendant does not rely just on a presumption of prejudice. His argument demonstrates the particular prejudice based upon the jury's verdict:

> Absent the inadmissible evidence from the nine telephone calls,[10] which the prosecutor played as its last evidence and emphasized in its closing argument, the jury might well have rejected robbery with a firearm and felony murder based on this underlying felony. In this way, the admission of the nine telephone calls, over defendant's continuous objections, likely prejudiced the jury on these other issues. The state certainly cannot show this error was harmless beyond a reasonable doubt.

In *State v. Barlowe*, this Court held the trial court erred by denying the defendant's motion to continue based upon his constitutional right to effective assistance of counsel where the State disclosed evidence of blood spatter and an expert report of bloodstain pattern analysis nine days before trial, 10 September 2001. 157 N.C. App. 249, 578 S.E.2d 660. Trial was to begin on 19 September 2001. Id. at 255, 578 S.E.2d at 664. Defendant's counsel made a motion to continue on 13 September 2001, noting his substantial but unsuccessful efforts to find a qualified expert available to review the blood-spattered pants and report before trial.[11] *Id.* This Court explained the correct analysis:

> The North Carolina Supreme Court has summarized the analysis applied by federal courts in reviewing refusals to grant a continuance where a constitutional right is implicated:
>
> > Courts have discussed numerous

---

[10] The State limited the number of phone calls it would be using in rebuttal from twenty-three to nine on Monday May 8, which was day eleven of Defendant's fifteen-day trial.

[11] The defendant's counsel's effort to have expert review was also impaired because there was at the relevant time "no commercial air traffic in the United States [due to the events of 11 September 2001] by which evidence and documents may be delivered to and from the expert that defendant selects." *Barlowe*, 157 N.C. App. at 255, 578 S.E.2d at 664 (alteration in original).

factors which are weighed to determine whether the failure to grant a continuance rises to constitutional dimensions. Of particular importance are the reasons for the requested continuance presented to the trial judge at the time the request is denied.

Id. at 253-54, 578 S.E.2d at 663 (quoting *State v. Roper*, 328 N.C. 337, 349, 402 S.E.2d 600, 607 (1991)).

North Carolina courts have followed suit in analyzing similar alleged violations under our state constitution. Some of the factors considered by North Carolina courts in determining whether a trial court erred in denying a motion to continue have included (1) the diligence of the defendant in preparing for trial and requesting the continuance, (2) the detail and effort with which the defendant communicates to the court the expected evidence or testimony, (3) the materiality of the expected evidence to the defendant's case, and (4) the gravity of the harm defendant might suffer as a result of a denial of the continuance.

*Id.* at 254, 578 S.E.2d at 663.

Thus, this Court has a duty to consider the factors as noted in *Barlowe*. First is the "the diligence of the defendant in preparing for trial and requesting the continuance." *Id.* The State informed Defendant's counsel on the evening before trial of its intent to use evidence it had twice assured him it would not use to attack Defendant's only defense, his mental capacity at the time of the shooting. Defendant's counsel had reasonably relied upon the State's repeated written assurances it would not be using the phone calls and continued instead to prepare for

19

the 45 witnesses the State had identified, including several disclosed just before trial. Defendant was diligent in preparing for trial and requested continuance as soon as humanly possible, when trial started. Defendant also requested in the alternative that the State not be permitted to use the phone calls; this would have allowed the trial to proceed with all of the evidence the State had planned to use until the Sunday evening before trial and with no disadvantage to Defendant. Defendant's counsel then requested additional time after jury selection to review the calls before opening statements; this request was also denied. Defendant then renewed his objections before presentation of the rebuttal evidence and explained why he was still not prepared to address the evidence.

The second factor is "the detail and effort with which the defendant communicates to the court the expected evidence or testimony." *Id.* Defendant's counsel went into great detail and effort in his objections to the jail calls, as noted above. But Defendant's counsel could not possibly have listened to over 100 hours of calls while also representing Defendant in a murder trial continuously for fifteen days, nor could he arrange to have an expert listen to them, discuss the issues with the expert, and be prepared to respond. Defendant could not inform the court of what evidence he may discover based on the phone calls or what his expert witness's response would be, just as the defendant in *Barlowe* could not inform the court of what opinion another expert may have upon reviewing the blood spatter and the

20

State's report. But the defendant in *Barlowe* was entitled to have time to get a review by a blood spatter expert so he could prepare for trial. *Barlowe* did not require the defendant to demonstrate the requested review by a blood spatter expert would be favorable to his case; such a standard would be impossible.

The third factor is "the materiality of the expected evidence to the defendant's case." *Id.* On the Sunday evening before trial, the State recognized that one of the most effective ways to rebut Dr. Corvin's testimony regarding Defendant's lack of capacity would be to attack the evaluation itself. The State could not legitimately refute that Defendant was intellectually disabled; its own expert agreed. The State attempted to refute Defendant's diagnosis of bipolar disorder, despite the fact that he had been diagnosed and treated for bipolar disorder before the shooting and his treatment resumed while he was in jail and continued through the time of trial.[12] The State could not refute that Defendant was impaired by alcohol, cocaine, and Benzodiazepine at the time of the shooting. The State could refute only the credibility and reliability of Dr. Corvin's report and his opinion on effects of these factors on Defendant's mental capacity. By attacking Dr. Corvin's evaluation with jail calls Dr. Corvin never had an opportunity to hear or respond to, the State sought to attack Defendant's only defense. The fact that the calls were used only as rebuttal evidence entirely eliminated Defendant's ability to respond.

---

[12] At sentencing, the trial court also recommended that Defendant "receive the benefit of mental healthcare treatment within the Department of Adult Corrections."

21

The last factor is the "the gravity of the harm defendant might suffer as a result of a denial of the continuance." *Id.* Defendant was unable to respond to the jail calls used to attack Dr. Corvin's evaluation. Because the evidence was presented in rebuttal, and Defendant's counsel had no opportunity to prepare any surrebuttal evidence, the State was able to attack his only defense. The majority does not appear to appreciate the potential significance of Defendant's inability to respond.

Prejudice is presumed if the likelihood that "'any lawyer, even a fully competent one, could provide effective assistance' is remote." *Rodgers*, 352 N.C. at 124, 529 S.E.2d at 675 (quoting *Tunstall*, 334 N.C. at 329, 432 S.E.2d at 336). Defendant's counsel was fully competent, but he could not listen to over 100 hours of jail calls while he was the sole counsel of record representing Defendant in a jury trial. Nor could he do any investigation those calls may require or discuss the calls with Dr. Corvin or any other expert. No attorney could provide effective assistance under these circumstances. The only thing Defendant's attorney could do was preserve the issue for appellate review by objecting strenuously to the State's use of the jail calls, stating the constitutional basis for those objections, and renewing those objections at every opportunity during the trial. He did exactly that.

Under the correct standard of review, reviewing *de novo* the legal issue based upon all of the circumstances presented, I would hold the trial court erred in denying Defendant's motion to bar the State from using the jail calls identified as evidence

22

the evening before the trial started, or, in the alternative, to continue the trial. Defendant was denied his right to effective assistance of counsel by his counsel's inability to review the jail calls or prepare for their use as needed for all stages of the trial: jury selection, opening arguments, examination of witnesses, preparing for the rebuttal evidence, and potential surrebuttal evidence. Because "the error amounts to a violation of defendant's constitutional rights, it is prejudicial unless the State shows the error was harmless beyond a reasonable doubt." *Barlowe*, 157 N.C. App. at 253, 578 S.E.2d at 662-63 (citing N.C. Gen. Stat. § 15A-1443(b) (2002)). "The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b).

The State has not even attempted to address its burden of showing the error was harmless beyond a reasonable doubt. Instead, the State argues that "[u]nless defense can show that the prosecution acted in bad faith in not providing the phone calls earlier, such 'failure to preserve potentially useful evidence does not constitute a denial of due process of law.' *State v. Graham*, 200 N.C. App. 204, 209, 683 S.E.2d 437, 441 (2009)." Defendant has not argued the State acted in bad faith, and *State v. Graham* deals with an issue of sanctions for an alleged discovery violation where the State impounded the defendant's car in 1996 but "lost" it at some point before trial.

Here, the State candidly admitted it did not obtain the jail calls for the purpose of addressing incapacity but instead was attempting to find information regarding a

23

particular witness, Defendant's girlfriend. Once the prosecutor determined that "we were not going to get any useful information" regarding the girlfriend, he "instructed people to stop listening to them" and informed Defendant's counsel he did not intend to use the jail calls. But on the Sunday before trial, it "dawned on" the prosecutor that "we do have recordings or we might" of Defendant on the day of his evaluation by Dr. Corvin. It took "quite a while" for the prosecutors to "figure out these jail calls as far as the dates that they were made" because the calls were in a different format than they have previously received. The State is correct there is no indication it acted in "bad faith" in changing its position as to use of the jail calls at the last minute, but the absence of bad faith does not change Defendant's counsel's ability to provide effective representation. In *Barlowe*, there was no indication of bad faith by the State in its failure to provide the blood-spattered pants or report regarding the evidence to defendant a few days before trial. 157 N.C. App. 249, 578 S.E.2d 660. The relevant inquiry was not why the State failed to produce the evidence earlier but the defendant's "lack of opportunity to refute this evidence by informed cross-examination of Agent Garrett, rebuttal of his testimony by someone qualified to express an opinion, or to provide other explanations for the presence of blood spatter on the pants[.]" *Id.* at 257, 578 S.E.2d at 665.

I therefore respectfully dissent and would hold the trial court erred in denying Defendant's motion to bar the State's use of the jail calls or in the alternative to

24

continue the trial to allow counsel time to prepare for the use of the jail calls. I would grant Defendant a new trial.